## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

LARRY CLARK, JOSEPH HAUSER,              )
LYDIA JOHNSON, and LINDA CAVAZOS,        )
individually, and on behalf of those     )
similarly situated,                      )
                                         )     No.: 3:22-cv-00628-NJR
                    Plaintiffs,          )
                                         )     Honorable Nancy J. Rosenstengel
v.                                       )
                                         )
MCDONALD'S CORPORATION,                  )
                                         )
                    Defendant.           )

---

### Request for Judicial Notice and Incorporation by Reference

Defendant McDonald's Corporation ("McDonald's") requests that the Court take judicial notice of certain documents pursuant to Rule 201 of the Federal Rules of Evidence, and that the Court consider documents cited in the First Amended Class Action Complaint ("Complaint"), in support of McDonald's Motion to Dismiss, submitted concurrently with this request:

- Ex. A- McDonald's Packaging and Waste webpage (https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/our-planet/packaging-and-waste.html) (*see* Complaint ¶ 63 n.34, which refers to this webpage)

- Ex. B- EPA: PFAS Explained (https://www.epa.gov/pfas/pfas-explained) (Complaint ¶ 74 n.37)

- Ex. C- EPA: Our Current Understanding of the Human Health and Environmental Risks of PFAS (https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas) (Complaint ¶ 75 n.38)

- Ex. D- Nicole W., *Breaking It Down: Estimating Short-Chain PFAS Half-Lives in a Human Population*, ENVIRON HEALTH PERSPECT. 2020;128(11):114002 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7657368/) (Complaint ¶ 77 n.39)

- Ex. E- Per- and Polyfluoroalkyl Substances (PFAS), Nat'l Toxicology Program (https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html)  (Complaint ¶ 80 n.41)

- Ex. F- Harvard T.H. Chan Sch. of Pub. Health, *Breastfeeding may expose infants to toxic chemicals* (Aug. 20, 2015) (https://www.hsph.harvard.edu/news/press-releases/breastfeeding-may-expose-infants-to-toxic-chemicals/)  (Complaint ¶ 97 n.46)

- Ex. G- EPA Fact Sheet: 2010/2015 PFOA Stewardship Program (https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program)

- Ex. H- FDA: Authorized Uses of PFAS in Food Contact Applications (https://www.fda.gov/food/chemical-contaminants-food/authorized-uses-pfas-food-contact-applications)

- Ex. I- FDA approval for Scotchban FC-807 (https://www.cfsanappsexternal.fda.gov/scripts/fdcc/?set=IndirectAdditives&id=AMMONIUMBISETHYLPERFLUOROOCTANESULFONAMIDOETHYLPHOSPHATE&sort=Sortterm_ID&order=ASC&startrow=1&type=basic&search=ammonium (Complaint ¶¶ 57-60)

- Ex. J- FDA food contact notification number database (searchable database available at https://www.cfsanappsexternal.fda.gov/scripts/fdcc/index.cfm?set=FCN)

- Ex. K- *McDowell v. McDonald's Corp.*, No. 1:22-cv-01688 (N.D. Ill. - filed Mar. 31, 2022) Complaint (ECF No. 1)

- Ex. L- *Collora v. McDonald's Corp.*, No. 1:22-cv-01904 (N.D. Ill. - filed Apr. 13, 2022) Complaint (ECF No. 1)

- Ex. M- Minutes order relating *McDowell* and *Collora* cases (ECF No. 10 in No. 1:22-cv-01688)

- Ex. N- EPA: Basic Information about Per- and Polyfluoroalkyl Substances (PFASs) (January 19, 2017) (https://19january2017snapshot.epa.gov/pfas/basic-information-about-and-polyfluoroalkyl-substances-pfass_.html#tab-1)

- Ex. O- Minnesota 3M PFAS Settlement (https://3msettlement.state.mn.us/) (Complaint ¶ 116 n.61)

- Ex. P- Reuters: *DuPont settles lawsuits over leak of chemical used to make Teflon* (Feb. 13, 2017) (corrected hyperlink available at https://www.reuters.com/article/us-du-pont-lawsuit-west-virginia-idUSKBN15S18U) (Complaint ¶ 117 n.62)

- Ex. Q- Environmental Working Group: *DuPont, Chemours and Corteva Reach $4 Billion Settlement on 'Forever Chemicals' Lawsuits* (Jan. 22, 2021) (https://www.ewg.org/news-insights/news-release/dupont-chemours-and-corteva-reach-4-billion-settlement-forever-chemicals) (Compliant ¶ 118 n.63)

- Ex. R-  June 1, 2022 Order Granting Motion to Dismiss in *GMO Free USA v. Coty Inc. et al.*, No. 2021 CA 004786 B (Superior Court of Washington, D.C.)

A district court may take judicial notice of "matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Doss v. Clearwater Title Co.*, 551 F.3d 634, 640 (7th Cir. 2008). Under the Federal Rules of Evidence, a fact is judicially noticeable when it is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Exhibits A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, and R are subject to judicial notice because they are publicly available documents that are reports by administrative bodies, court decisions and court documents, documents in the public record, and undisputed website content. *See Schmierbach v. Alton & S. Ry. Co.,* No. 18-01684-NJR-GCS, 2019 WL 2644471, at *2 n.2 (S.D. Ill. June 27, 2019) (taking judicial notice of an administrative decision); *Blaney v. Godinez*, No. 17-CV-1099-DRH, 2018 WL 4932453, at *1 n.1 (S.D. Ill. Oct. 11, 2018) (taking judicial notice of court documents from other cases); *Smith v. Hous. Auth. of Southbend*, 744 F. Supp. 2d 775, 785 (N.D. Ind. 2010) ("The Seventh Circuit has stated that it is proper to take judicial notice of such things as historical documents, documents contained in the public record, and reports of administrative bodies, and state court decisions." (citing *520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1138 n.14 (7th Cir. 2008)); *Goplin v. WeConnect, Inc*., 893 F.3d 488, 491 (7th Cir. 2018) (holding that the district court did not err by taking judicial notice of employer's website content); *United States ex rel. Suarez v. AbbVie, Inc*., 503 F. Supp. 3d 711, 721 (N.D. Ill. 2020) (taking judicial notice of websites and blogs related to prescription immunosuppressive medication as matters of public record); *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc*., 402 F. Supp. 3d 427, 431 (N.D. Ill. 2019) ("We may take judicial

notice of undisputed material hosted on a party's public website.") (internal quotation marks and citations omitted). As such, these documents' accuracy is "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Moreover, the Court may incorporate by reference documents cited in the Complaint: "Where a document is referenced in the complaint and central to plaintiff's claims, . . . the Court may consider it in ruling on the motion to dismiss." *United States v. 286,161 Bottles et al.*, No. 19 C 3876, 2020 WL 550598, at *1 n.1 (N.D. Ill. Feb. 3, 2020) (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009)); *see also Treo Salon, Inc. v. W. Bend Mut. Ins. Co.*, 538 F. Supp. 3d 859, 863 (S.D. Ill. 2021) (considering an insurance contract on a motion to dismiss that was referenced in the plaintiff's complaint).

Exhibits A, B, C, D, E, F, O, P, and Q are incorporated by reference as they are either directly cited in the Complaint or cited in a source cited in the Complaint. Plaintiffs cite to sources throughout their Complaint, which purportedly support their claims that all PFAS substances are the same and that McDonald's falsely advertised its products. Thus, the exhibits are referenced in the Complaint and central to the Plaintiffs' claims. *See 286,161 Bottles*, 2020 WL 550598, at *1 n.1; *Polley v. Nw. Univ.*, 560 F. Supp. 3d 1197, 1205 (N.D. Ill. 2021) (denying plaintiff's motion to strike an exhibit presented in a motion to dismiss, because, while it was not specifically referenced in the complaint, it was part of the school's course catalogs, which were referenced in the complaint). The Court should therefore incorporate by reference these exhibits into the Motion to Dismiss.

WHEREFORE, Defendants request that the Court take judicial notice and/or incorporate by reference the documents submitted concurrently with this Request, in conjunction with Defendants' Motion to Dismiss.

Dated: June 1, 2022                 Respectfully submitted,

/s/ Trenton H. Norris
Trenton H. Norris (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
3 Embarcadero Center, Suite 1000
San Francisco, CA 94111-4024
Tel: (415) 471-3100
Fax: (415) 471-3400
Email: trent.norris@arnoldporter.com

Lori B. Leskin (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 W. 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Fax: (212) 836-8689
Email: lori.leskin@arnoldporter.com

Peter H. Vogel (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
70 W. Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
Fax: (312) 583-2360
Email: peter.vogel@arnoldporter.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that the above filing was served upon counsel

of record via the Court's electronic filing system on June 1, 2022.

*/s/ Trenton H. Norris*
Trenton H. Norris (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
3 Embarcadero Center, Suite 1000
San Francisco, CA 94111-4024
Tel: (415) 471-3100
Fax: (415) 471-3400
Email: trent.norris@arnoldporter.com

# EXHIBIT A

Our Purpose & Impact  >  Our Planet  >  Packaging & Waste

# Packaging & Waste



**Jump To:** Progress Highlights | Why It Matters | Our Strategy | Our Performance | Our Actions

---

## Progress Highlights

**Over 80%** of the guest packaging sourced for McDonald's restaurants was made of fiber sources. The remaining 20% was made of plastic

In total, **80%** of our guest packaging came from renewable, recycled or certified sources

**99.6%** of our primary fiber-based guest packaging, was sourced from recycled or certified sources and supported deforestation-free supply chains

We offered guests the opportunity to recycle packaging waste in over **25%** of restaurants in our 30 largest markets

Please see our performance section and footnotes below for additional detail.

# Why It Matters

Improving the sustainability of our packaging and moving toward a circular economy are top priorities for our business. These strategies support our long-term business resilience, help keep our communities clean and aim to help protect the planet for future generations.

> **We realize the linear economic model – where we take, make and dispose of materials – can create waste that harms nature and impacts communities. That's why we believe the future of materials needs to be circular wherever possible.**

One of our biggest opportunity areas is our packaging. It plays an important role in reducing food waste and helping us serve hot and freshly prepared food quickly and safely to customers. But we know that when packaging and plastic waste aren't recovered or recycled correctly, it can have a negative impact on our planet, creating litter and pollution.

There are systemic challenges that stand in the way of achieving a circular economy, but we want to invest and engage in strategic partnerships that advance circularity in our communities globally. As one of the world's largest restaurant company, we believe not only that McDonald's has a role to play in addressing this issue, but that we can use our scale to help transform packaging and waste systems across our industry.

Back to Top



# Our Strategy

We will use our global scale and reach to help implement and accelerate solutions to keep waste out of nature and valuable materials in use. To achieve this, we will design out waste and advance recovery and reuse of materials throughout our value chain, prioritizing areas where we can have the greatest impact, such as packaging.

## Progress in Sustainable Packaging and Recycling

When it comes to our packaging, we look at all aspects of our footprint and beyond. It's a process that encompasses a wide range of initiatives to reduce our use of packaging, switch to more sustainable materials and help our customers reuse and recycle too.

**We've set goals to source 100% of our guest packaging (fiber and plastic) from renewable, recycled or certified sources, and**

**to recycle guest packaging in 100% of McDonald's restaurants, by 2025.[1] Once achieved, McDonald's will no longer source any primary guest packaging from virgin fossil fuel-based plastics.**

**Additionally, we will recycle guest packaging in 100% of McDonald's restaurants by the end of 2025.[1]**

We understand that recycling infrastructure, regulations and consumer behaviors vary from city to city and country to country, but we plan to be part of the solution and help influence powerful change.

**Our Priorities:**

- **Eliminate packaging** through design innovation, introducing reusable solutions and encouraging behavior change to reduce usage.

- **Streamline materials** used in our guest packaging to enable easier recovery without compromising on quality and performance.

- **Transition from the use of virgin fossil fuel-based plastics** in our primary guest packaging to 100% renewable, recycled or certified sources by end of 2025.

- **Recover and recycle** by finding ways to scale up systems to allow for greater acceptance of recycling, and making it easier for our guests to recycle too.

- **Close the loop** by using more recycled materials, including recycled plastic content, in our packaging, restaurants and facilities, and helping to drive global demand for recycled content.

- **Explore the use of reusable models** in our restaurants in a way that provides customers options that reduce waste while maintaining safety and experience standards. We view reusables as one of many tools to help accelerate more circular packaging solutions and drive progress on our current packaging and waste goals.

The learnings and insights from this work also feed into other materials we use in our system, such as Happy Meal® toys, transport packaging and building materials.

# Tackling Plastic Pollution

While our goals focus on fiber and plastic packaging, our plastics strategy specifically addresses how we are working to prevent plastic waste from ending up in nature.

We believe that some plastic packaging is necessary in the food industry to maintain quality and safety. Plastic has many benefits compared with other materials. For example, it's lighter than glass and fiber, and therefore causes fewer $CO_2$ emissions when transported. However, we know that when plastic is not recycled or recovered correctly, it creates plastic pollution, which is harmful to the environment, and we want to play our part in addressing this issue.

To improve capture rates and reduce the leakage of plastic waste into the environment, we are working to:

- Reduce plastic in guest packaging that is hard to recycle, is not needed for safety or functionality and is likely to leak into the environment, such as straws, plastic bags and cutlery.

- Prioritize innovation of new materials and redesign of plastic packaging to be more recyclable. We understand the importance of streamlining plastics in order to improve recycling rates. Our goal is to streamline material types and design packaging so that it's easier for customers to recycle.

- Increase the amount of recycled plastic content used in all parts of our restaurants, where possible, to help drive demand for plastic recycling. For example, using recycled plastics in trays, Happy Meal toys and interior design elements of our restaurants.

- Partner with companies and nonprofit organizations to support the development and expansion of recycling programs for plastics.

- Partner with Franchisees to support community-level anti-litter initiatives such as consumer communication campaigns and cleanup days.

The COVID-19 pandemic has also highlighted the importance of food packaging and personal safety equipment, such as gloves and masks, which have been crucial to ensure the safety of our restaurant employees. We are mindful of short-term challenges, such as additional waste caused by disposable safety wear, as well as some increase in plastic use. Hygiene and safety are currently at the forefront of customers' minds, and our challenge is to ensure they are balanced with long-term sustainability.

Visit our [People Safety](#) page to learn more about our commitment to safety.

# Meeting Customer Expectations of Convenience, Safety and Sustainability

Together with our Franchisees, suppliers and industry partners, we invest in research and development of new materials and packaging designs that fit our customers' needs for convenience, food safety and sustainability.

In partnership with our packaging suppliers, we have a holistic process on product stewardship, which includes continuous evaluation and robust testing for chemicals used in our packaging. This helps ensure that we serve food in packaging that is both safe and functional for its intended use.

We eliminated a significant subset of PFAS, including Perfluorooctanoic acid (PFOA) and Perfluorooctanesulfonic acid (PFOS), from all guest packaging globally in 2008. We also eliminated BPA/BPS and phthalates from our guest packaging in 2013 and in 2015, respectively.

As a next step in our product stewardship journey, we are committed to remove all added fluorinated compounds from our guest packaging materials globally by 2025.[1] By the end of 2020, less than 7.5% of our guest packaging items globally still contained added fluorinated compounds. For these items, we continue our work to find and apply alternative coating materials that offer the right grease-resistant barriers.

> ## McDonald's packaging materials are also compliant with the U.S. Food and Drink Administration (FDA), EU and all local regulatory bodies. We abide by all state, federal and national-level regulations, and verify through valid chemical testing.

Being good neighbors is important to McDonald's, which is why we're always innovating to meet our customers where they are, and making new commitments as our stewardship evolves.

One of the benefits of being a global company operating in more than 100 countries is our ability to test packaging and recycling concepts in different markets to find the sustainable solutions our customers want. By collecting customer feedback in our restaurants, we can identify the best solutions to accelerate and scale across multiple markets. For example, across the world, we've been trialing paper straws in place of plastic ones and running straws-upon-request initiatives. During earlier trials, some customers had challenges with respect to the ease of use and durability of the straws, but following continued innovation, testing and learning, we have redesigned them to address these issues.

## Minimizing Waste Behind the Counter

Behind the scenes in our kitchens and supply chain, we are working with suppliers to reduce, reuse and recycle. In restaurants around the world, we recycle kitchen waste materials, such as cooking oils, organic waste and corrugated cardboard

used in packaging, all of which can be turned into new resources.

In multiple markets, our logistics providers play a key role in our commitment to reduce waste by collecting and back-hauling recyclables when they deliver supplies to our restaurants. This not only helps recycle material from restaurants in remote locations, it also reduces road mileage because we no longer have to arrange for a separate waste company to make the collection.

## Collaborating to Drive System Change

Addressing waste is not a challenge we can tackle alone. We are engaging with the wider business community, expert nongovernmental organization (NGO) partners, political stakeholders and academia, as well as our Franchisees, suppliers, customers and our restaurant crew, to help drive change at scale.

We support multi-stakeholder initiatives to advance research and innovation and to advocate for policies that support the transition to a circular economy. We are proud to be a Principal Member of *ReSource: Plastic*, World Wildlife Fund's platform to leverage the power of business to stop the flow of plastic waste into nature. *ReSource* provides a critical hub to help companies collectively identify, measure and advance solutions at scale. Over the past year, we've shared our plastic footprint data with *ReSource* as part of a collective effort to find ways to reduce plastic pollution.

We are also members of the Foodservice Packaging Institute's (FPI) Paper Recovery Alliance and Plastics Recovery Group (PRA/PRG), along with supply chain partners and other industry brands. These groups work collaboratively to increase the amount of foodservice packaging that is composted and recycled. Recent initiatives have included the creation of the Design Guide for Foodservice Plastics Recyclability with the Association of Plastic Recyclers, partnering with many communities to add foodservice packaging recovery to U.S. households, and work with composters to accept foodservice packaging in their stream.

## Helping Support the Sustainable Development Goals

Our packaging and recycling efforts help support the UN Sustainable Development Goals, a global agenda to end poverty, protect the planet and ensure prosperity for all, in particular:

 Goal 9: Industry, Innovation and Infrastructure (Specifically target 9.4)

 Goal 11: Sustainable Cities and Communities (Specifically target 11.6)



Goal 12: Responsible Consumption and Production (Specifically target 12.5)

Goal 14: Life Below Water (Specifically target 14.1)

Goal 17: Partnerships for the Goals (Specifically target 17.16)

Back to Top



## Our Performance

We track progress against our goals through supplier and restaurant reports on packaging composition, usage and waste. We use robust digital reporting tools that are subject to internal

and external audits.

As we continue to enhance our methodology and data quality in future years, we can expect annual progress figures to adjust in future reporting cycles.

 **Goal 1**

## By the end of 2025, all of our guest packaging will come from renewable, recycled or certified sources.[1]

 **Progress**

By the end of 2020, we were approximately **80%** of the way toward our goal to source all guest packaging from renewable, recycled or certified sources by 2025.

**99.6%** of our primary fiber-based guest packaging, was sourced from recycled or certified sources and supported deforestation-free supply chains in 2020.

---

 **Goal 2**

## By the end of 2025, recycle guest packaging in 100% of McDonald's restaurants. We understand that recycling infrastructure varies from city to city and country to country, but we plan to be part of the solution and help influence powerful change.[1]

 **Progress**

By the end of 2020, we offered guests the opportunity to recycle packaging waste in over **25%** of restaurants in our 30 largest markets.

In these restaurants, guest packaging is collected in customer-facing recycling bins, or collected for sorting and recycling back of house or off-site.

In regions where infrastructure is more robust, we see greater progress toward our goal. For example, on average, just under **70%** of our restaurants in McDonald's largest European markets are already providing recycling for guest packaging.

 **Goal 3**

# By the end of 2025, we will have removed all added fluorinated compounds from our guest packaging.[1]

 **Progress**

By the end of 2020, less than 7.5% of our guest packaging items still contained added fluorinated compounds.[1] For these items, we continue our work to find and apply alternative coating materials that offer the right grease-resistant barriers.

Back to Top

 **Goal 4**

# By the end of 2025, McDonald's ambition is to drastically reduce plastics in Happy Meal Toys around the globe and transition to more sustainable materials.[2]

 **Progress**

Achieving this goal will result in an approximately 90% reduction in the virgin fossil fuel based plastic used to make Happy Meal toys with every toy in a Happy Meal to be made using more materials from renewable, recycled, or certified sources[2] by the end of 2025.

Over the past two years, markets like the UK, Ireland and France have rolled out new Happy Meal toy innovations already resulting in a 30% reduction in plastic use. We're scaling these efforts globally to continue to reduce plastics from our System on our journey to design and innovate sustainably.

[Back to Top](#)



# Our Actions

## Material Innovation and Packaging Design

We are testing a range of new materials and designs in our restaurants around the world.

### Cutting Down on Plastics

We have given our McFlurry® soft serve ice-cream packaging a makeover, eliminating the need for a separate plastic lid. The initiative has been implemented in Australia, New Zealand, India and most markets in Asia Pacific and Europe. In Europe alone, this change will save more than 1,200 metric tons of plastic per year.

In several markets across Europe and in Australia, New Zealand, Malaysia, India and Taiwan, we have also introduced a paper-based cup for shakes, moving away from the traditional plastic cups.

In France, we launched a 100% fiber Sundae cup to replace our plastic packaging while maintaining the iconic design. It is packaging innovations like these that we work to scale more widely across markets.

## Introducing a New Strawless Lid

Across France, we have introduced an innovative new fiber lid made from certified sources for cold drinks, which replaces both the plastic lid and the need for a straw. We are encouraged by successful tests of this lid and while there are some obstacles to overcome, such as consumer acceptance of drinking from a new, less familiar material, the strawless lid could save 1,200 metric tons of plastic per year in France alone.

In China, McDonald's has begun to phase out plastic straws for cold drinks in around 1,000 restaurants across Beijing, Shanghai, Guangzhou and Shenzhen. By introducing a new lid that customers can drink from directly, the move is expected to reduce 400 metric tons of plastic waste per year.

Additionally, in Latin America, as part of its strategy to reduce plastic consumption across the 20 markets in which it operates, our Franchisee Arcos Dorados has removed all lids and straws from cold drinks for dine-in customers.

We are deploying alternatives to plastic cutlery in several markets, including transitioning to wooden cutlery in Australia and Europe. This has led to a plastic reduction of 2,585 metric tons. Trials are being conducted for paper alternatives to our spoons, in a bid to find the material that meets customer preferences, operational functionality and sustainability.

## Piloting Reusable Cup Schemes

In 2020, we announced a global partnership with TerraCycle's circular packaging service, Loop, to test a new reusable cup model for hot beverages. The initiative, which is currently being trialed across select McDonald's restaurants in the U.K., will help customers enjoy their favorite McDonald's hot drink in a reusable cup, cutting down on packaging waste.

This new partnership will allow customers to reduce waste by choosing a durable Loop-created cup, for a small deposit. The deposit can then be redeemed by returning the cup to participating restaurants to be safely sanitized through the Loop system and reused again in McDonald's restaurants.

Exploring reusable packaging is part of our wider strategy to implement and accelerate circular solutions that keep waste out of nature and to shift to more sustainable packaging materials.

Through pilots in several markets, including France, Philippines, South Korea and Malaysia, we are assessing the feasibility and impact of reusable solutions for our packaging that also maintain the highest safety standards and convenience for

in-store and on-the-go consumption.

## Finding a New Solution for Plastic Cutlery

We are testing alternatives to plastic cutlery in several markets, including transitioning to wooden cutlery in Australia and Europe, and testing paper alternatives to our McFlurry spoons, in a bid to find the material that meets customer preferences, operational functionality and sustainability.

In France, we have transitioned our knives, forks and spoons to wood. These changes, paired with innovations in the packaging of milkshakes, salads and straws, will allow our restaurants in France to reduce plastic packaging by more than 2,600 metric tons.

## Optimizing Packaging Weight and Size

We are continuously searching for ways to optimize packaging. For instance, McDonald's Taiwan is gradually switching plastic packaging and cutlery to paper and wood and optimizing packaging design to reduce waste. McDonald's Canada, meanwhile, has switched to napkins that are 20% smaller and produced with 100% recycled fiber. Across several markets in Latin America, Arcos Dorados has lightweight spoons and replaced plastic packaging such as salad plates with non-plastic alternatives.

By switching to fiber wraps instead of card boxes, McDonald's Netherlands has saved 250 metric tons of packaging, while in China, we have optimized the size of our cutlery and reduced the amount of plastic we use by about 10%.

We also have several packaging initiatives in test phases in the U.S., designed to reduce materials currently used to produce a range of products, such as sandwich clamshells and wraps, napkins, McCafé® hot and cold cups, and plastic car cups.

In 2018, McDonald's U.S. joined forces with Starbucks and Closed Loop Partners as a convening member of the NextGen Consortium, a multi-year consortium that aims to address single-use food packaging waste globally. NextGen Cup is the first initiative by the NextGen Consortium, that aims to advance recoverable solutions for the fiber, hot and cold to-go cup system. The NextGen Cup Challenge identified 12 innovative solutions for single-use cups that are functional to a high standard, minimize and streamline material use, and encourage wide recoverability.

While we work on vetting and testing these cup solutions for potential use in the McDonald's System, the NextGen Consortium is continuing to expand its work to explore the viability of reusable cup systems, and improve and increase recycling acceptance of both the fiber and polypropylene cups through working directly with cities in the U.S., as well as through membership in The Recycling Partnership's Polypropylene Coalition.

> **The leadership exhibited by McDonald's and other NextGen Consortium partners demonstrates their commitment to solving a critical global waste issue and accelerating change together. Collaboration is critical if we are to innovate, test and scale the sustainable cup solutions of our future.**

Bridget Croke, Managing Director, Closed Loop Partners



## Transforming Our Happy Meal Toys

For more than four decades, the McDonald's Happy Meal has lived up to its name, bringing joy to children and families around the globe. Our customers who love the Happy Meal for the kids in their lives today also care deeply about the environment that this next generation will grow up in tomorrow.

With fun and safety still front and center, our ambition is to drastically reduce plastics and offer sustainable Happy Meal toys[2] globally by the end of 2025.

This transition to more renewable, recycled or certified materials for toys is already underway and will result in an approximately 90% reduction in virgin fossil-fuel based plastic use against a 2018 baseline— nearly the equivalent of the population of Washington, D.C., eliminating plastics from their lives for a year.

In 2020, McDonald's also stopped manufacturing toys with batteries or electronic components, reducing waste and improving the carbon footprint of our toys.

In addition to these efforts, beginning in 2018, McDonald's Japan initiated a toy recycling program with the Japanese Ministry of the Environment to collect plastic Happy Meal toys and convert them into restaurant serving trays. In the first year, McDonald's Japan collected around 1.27 million used plastic toys that were turned into over 165,000 trays. In 2019, we expanded the program and collected 3.4 million used plastic toys, followed by about 3 million toys in 2020.



## Recovering and Recycling Our Packaging

Recycling shouldn't be a chore, which is why we want to make it easier for our guests. We have installed sorting and recycling points in select restaurants across our top markets and are implementing improved recycling bin signage to make the recycling process easier to understand.

In Germany, Austria, Czech Republic and Slovakia, our crew collects customer waste to sort for recycling, while in the Netherlands, we take the process off-site completely, sending customer waste to an innovative waste sorting facility.

While we design our packaging to be recyclable, recycling infrastructure varies from market to market. In some markets, we partner with municipalities, waste collectors and processors to find recycling opportunities for valuable parts of our customer waste, like plastics, clean paper, cups or bottles.

### Keeping Communities Clean

Our restaurant crews across the world work to keep their communities clear of litter by means of regular clean-ups in the perimeter around our stores. In 2020, the COVID-19 pandemic prevented us from organizing large cleanup events. Instead, our owners, operators and restaurant teams worked to prevent and clean up litter in other creative ways:

- McDonald's **Germany** used social media to raise awareness and encourage customers to dispose of packaging waste correctly. "Social distancing? Not for the trashbin!"

- In the **Netherlands**, we increased customer awareness and reduced litter through the mass-media campaign "You Bin It You Win It," awarding prizes to customers who disposed of their waste correctly. This campaign was followed by a series of others, such as the Trashdance challenge, aimed at incentivizing customers to use trashbins and clean up litter.

- McDonald's **Russia** organized cleanups and eco lessons in over 50 cities in September and October 2020.

We also support national organizations that aim to end littering and promote recycling in communities across their countries. For example, in the **U.S.**, McDonald's is a long-standing supporter of Keep America Beautiful, helping to advance their work to end littering, improve recycling and beautify local communities across the country.



# Closing the Loop

We intend to expand our use of recycled materials in our restaurants, packaging and supply chains to play our role in creating market demand for recycled content. That's why in multiple markets we've incorporated recycled content in both fiber and plastic packaging, such as our coffee, frappe and sundae cups.

We also always look to close the loop where we can, buying back our own recycled materials to produce new packaging, fuel, clothing or furniture.

## Reusing Cooking Oil From Fries to Fuel Our Trucks

Our cooking oil is a valuable resource, even after it's been used to cook our famous French Fries. That's why we collect and recycle used cooking oil (UCO) into biofuel across the globe. In some markets, we are taking these efforts a step further with our logistics partners HAVI and Martin Brower. In Switzerland, Ireland and the Netherlands, for example, we use our own UCO to fuel our delivery trucks with renewable and biodiesels, creating value out of waste while cutting down carbon emissions from logistics.

In the UAE in 2020, McDonald's passed a major milestone when its suppliers' fleet of logistics trucks traveled approximately 10 million miles running on 100% recycled vegetable oil from McDonald's UAE restaurants through the biodiesel initiative.

In the U.K., we work to close the loop on organic waste as well. Food waste from stores is collected and converted into gas and electricity, some of which is supplied to the neighbouring Arla dairy. The dairy supplies all of McDonald's organic milk, which is delivered in Martin Brower's biodiesel-fuelled trucks, and so the circle continues.

In France, we currently have our LOGRE system pilot, which collects organic waste and converts it into renewable natural gas for the public gas network. This fuel then powers our LOGRE Bio-CNG trucks, closing the loop.

## Recycling Coffee Waste to Make Cars

In North America, we have partnered with the Ford Motor Company to recycle coffee chaff – the husk of the coffee bean that peels off during roasting. The recycled chaff is heated and the residue mixed with other materials, before being molded into headlamp housings. Turning the coffee chaff into residue enables Ford to produce components that are 20% lighter than the traditional material and also require up to 25% less energy to produce. The use of coffee chaff as a resource shows how companies can work together to increase participation in the closed-loop economy.

## Recycling Ocean Plastic Waste

Since 2018, McDonald's Norway has been working in partnership with a small group that makes plastic pellets from the marine waste collected by fishermen along the Nordland coast. The group creates products out of the marine plastic,

like sunglasses, shoes and now, 100% recycled trays for all McDonald's Norway restaurants.

In 2020, we opened our 1,000th restaurant in Australia, which we used to test and roll out multiple circular initiatives, including a circular Playplace® that repurposed old play equipment into new decks, climbers, slide tubes and window panels. 60% of the entire structure is sourced from old play equipment, while the remaining 40% of material is fully recyclable.

[Back to Top](#)

# Footnotes

[1] **Packaging: Scope:** Inclusive of centrally managed guest packaging and Happy Meal book and toy packaging. **Renewable sources** refer to material that is composed of biomass from a living source and that can be continually replenished. Renewable applies to plastics only, not fiber. Source: ISO 14021:2016, for plastic, ASTM 6866 or ISO 16620-2. **Recycled sources** refer to material that has been reprocessed from recovered (reclaimed) material by means of a manufacturing process and made into a final product or into a component for incorporation into a product. Recycled material applies to plastics and fiber. Fiber-based packaging made from 100% recycled sources must be third-party verified, unless certified under a Chain of Custody forest management standard. Source: ISO 14021:2016. **Third party verification** means that an independent accredited organization has reviewed the manufacturing process of a product and has determined that the final product complies with standards for the attributed claim. Credible third parties include professional auditing and certification bodies. **Certified sources** refer to suppliers of primary fiber-based packaging to the McDonald's System which comply with the Forest management and Chain of Custody certification requirements set out by one of the following schemes: Forest Stewardship Council™ (FSC®); Programme for the Endorsement of Forest Certification (PEFCTM) or PEFC endorsed national systems including, for example, Sustainable Forestry Initiative® (SFI®), CSA Group (Canada), and Cerflor (Brazil). McDonald's requires all wood fiber sourced from Argentina, Cambodia, China, Indonesia, Laos, Malaysia, Russia, and Vietnam to be Forest Stewardship Council® (FSC®) Certified or FSC Controlled Wood sources with full chain of custody certification. **Primary fiber-based guest packaging** refers to products that are used to package guest food on premises at McDonald's restaurants. This type of packaging includes containers, cups, wraps, bags for food, beverages, napkins, folding cartons, clamshells, wraps, food service bags, napkins, salad bowls, Happy Meal cartons, drink carriers and cup carriers. **Perfluorinated compounds** are known to be historically persistent in the environment. McDonald's commits to not intentionally adding fluorinated compounds through our processes, but fluorinated compounds present in the local environment make

it difficult to remove all traces of fluorine from packaging. Please refer to Our Conserving Forest Page for additional definitions. **Exclusions:** Primary fiber-based packaging in food packaged off-site McDonald's restaurants; wood stirrers and cutlery, tray liners, straws and limited locally sourced items.

[2]**Toys: Scope:** Inclusive of all toys. **Fiber-based toys or fiber components in the toys**: 100% certified fiber required. **All other materials:** McDonald's ambition is to reduce the use of virgin fossil fuel based plastics, offer sustainable toys by the end of 2025 and not manufacture electronics and batteries in Happy Meal toys globally. For bio- and plant-based plastics to be considered sustainable for McDonald's, a minimum of 60% of plastic weight is required to come from recycled or renewable content or a combination of recycled and renewable content, though in many practical applications we anticipate that percentage will be much higher. The remaining 40% may be conventional fossil-fuel based material. These thresholds were developed in conjunction with input from NGOs, external manufacturing partners, and scientists, and based on an assessment of sustainable toy and packaging industry leaders so that our targets reflected current sustainable engineering capabilities to maintain safety and functionality. Our efforts will result in an approximate 90% reduction in virgin fossil-fuel based plastic use against a 2018 baseline. **Virgin fossil-fuel based plastics/Conventional/Traditional Plastic:** plastics made from fossil fuel feedstock. **Renewable sources** refer to material that is composed of biomass from a living source and that can be continually replenished. Renewable applies to plastics only, not fiber. Source: ISO 14021:2016, for plastic, ASTM 6866 or ISO 16620-2. **Recycled sources** refer to material that has been reprocessed from recovered (reclaimed) material by means of a manufacturing process and made into a final product or into a component for incorporation into a product. Recycled material applies to plastics and fiber. Fiber-based packaging made from 100% recycled sources must be third-party verified, unless certified under a Chain of Custody forest management standard. Source: ISO 14021:2016. **Certified sources** refer to suppliers of primary fiber-based packaging and toys to the McDonald's System which comply with the Forest management and Chain of Custody certification requirements set out by one of the following schemes: Forest Stewardship Council™ (FSC®); Programme for the Endorsement of Forest Certification (PEFCTM) or PEFC endorsed national systems including, for example, Sustainable Forestry Initiative® (SFI®), CSA Group (Canada), and Cerflor (Brazil). McDonald's requires all wood fiber sourced from Argentina, Cambodia, China, Indonesia, Laos, Malaysia, Russia, and Vietnam to be Forest Stewardship Council® (FSC®) Certified or FSC Controlled Wood sources with full chain of custody certification. The thresholds described above do not include the presence of adhesives, glues, inks, paints and coatings.

Back to Top

# Latest Stories



**These Airport McDonald's Recycle Fry Oil into Jet Fuel – Here's How →**

May 18, 2022

Sustainability



**These Are The Winners Of McDonald's Anti-Littering Contest in Finland →**

November 23, 2021

Planet



**How McDonalds India is Supporting People With Disabilities →**

March 16, 2021

Packaging And Waste

## More in Our Purpose & Impact



**Responsible Sourcing**

We have set ambitious goals to guide our responsible sourcing efforts.

Read More



**Food Waste & Donations**

We're directing essential resources to the people who need it most.

Read More



**Climate Action**

We're partnering to reduce emissions across our restaurants and supply chain.

[Read More](#)



**Conserving Forests**

Our ambition is to eliminate deforestation from our supply chain by 2030.

[Read More](#)

Our Company                                                    +

Our Purpose & Impact                                                              +

Investors                                                                         +

All Stories                                                                       +

Franchising Overview                                                              +

Contact                                                                           +

---

PRIVACY (UPDATED)

California Privacy Notice     TERMS & CONDITIONS     Do Not Sell My Personal Information

©2017-2019 McDonald's. All Rights Reserved.

# EXHIBIT B


An official website of the United States government
Here's how you know

## United States Environmental Protection Agency

MENU

Search EPA.gov

**PFOA, PFOS and Other PFAS**

CONTACT US <https://epa.gov/pfas/forms/contact-us-about-pfoa-pfos-and-other-pfas>

# PFAS Explained

| **PFAS News** |
| --- |
| Read the latest news from EPA about PFAS. <https://epa.gov/pfas/press-releases-related-pfas> |

| **What EPA is Doing** |
| --- |
| Learn what EPA is doing to address PFAS. <https://epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024> |

EPA is committed to providing meaningful, understandable, and actionable information on per- and polyfluoroalkyl substances – known as PFAS – to the American public. The information provided here is intended to explain some of the important background information needed to understand the details of specific actions EPA takes to address PFAS, and other emerging events related to PFAS. It covers the following topics:

1. Our current understanding of the human health and environmental risks PFAS <https://epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas>

2. Increasing our understanding of the health risks from PFAS and how to address them <https://epa.gov/pfas/increasing-our-understanding-health-risks-pfas-and-how-address-them>

3. Meaningful and achievable action steps that can be taken to reduce risk <https://epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk>

## What EPA Has Learned So Far

- PFAS are widely used, long lasting chemicals, components of which break down very slowly over time.

- Because of their widespread use and their persistence in the environment, many PFAS are found in the blood of people and animals all over the world and are present at low levels in a variety of food products and in the environment.

- PFAS are found in water, air, fish, and soil at locations across the nation and the globe.

- Scientific studies have shown that exposure to some PFAS in the environment may be linked to harmful health effects in humans and animals.

- There are thousands of PFAS chemicals, and they are found in many different consumer, commercial, and industrial products. This makes it challenging to study and assess the potential human health and environmental risks.

- Learn more about our current understanding of PFAS. <https://epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas>

## What We Don't Fully Understand Yet

- EPA's researchers and partners across the country are working hard to answer critical questions about PFAS:

  ○ How to better and more efficiently detect and measure PFAS in our air, water, soil, and fish and wildlife

  ○ How much people are exposed to PFAS

  ○ How harmful PFAS are to people and the environment

  ○ How to remove PFAS from drinking water

  ○ How to manage and dispose of PFAS

- This information will help EPA and state, local, and tribal partners make more informed decisions on how best to protect human health and the environment.
- Learn more about how we are increasing our understanding of the health risks of PFAS. <https://epa.gov/pfas/increasing-our-understanding-health-risks-pfas-and-how-address-them>

---

PFAS Home <https://epa.gov/pfas>

**PFAS Explained**

Action steps to reduce risk <https://epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk>

---

EPA's current understanding <https://epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas>

---

Increasing our understanding <https://epa.gov/pfas/increasing-our-understanding-health-risks-pfas-and-how-address-them>

---

EPA actions to address PFAS <https://epa.gov/pfas/epa-actions-address-pfas>

---

PFAS Strategic Roadmap <https://epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024>

---

Data and Tools <https://epa.gov/pfas/pfas-resources-data-and-tools>

---

State Information <https://epa.gov/pfas/us-state-resources-about-pfas>

---

Contact Us <https://epa.gov/pfas/forms/contact-us-about-pfoa-pfos-and-other-pfas> to ask a question, provide feedback, or report a problem.



# Discover.

**Accessibility** <https://epa.gov/accessibility>

**Budget & Performance** <https://epa.gov/planandbudget>

**Contracting** <https://epa.gov/contracts>

**EPA www Web Snapshot** <https://epa.gov/utilities/wwwepagov-snapshots>

**Grants** <https://epa.gov/grants>

**No FEAR Act Data** <https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

**Plain Writing** <https://epa.gov/web-policies-and-procedures/plain-writing>

**Privacy** <https://epa.gov/privacy>

**Privacy and Security Notice** <https://epa.gov/privacy/privacy-and-security-notice>

# Connect.

**Data.gov** EXIT <https://www.data.gov/>

**Inspector General** <https://epa.gov/office-inspector-general/about-epas-office-inspector-general>

**Jobs** <https://epa.gov/careers>

**Newsroom** <https://epa.gov/newsroom>

**Open Government** <https://epa.gov/data>

**Regulations.gov** EXIT <https://www.regulations.gov/>

**Subscribe** <https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

**USA.gov** EXIT <https://www.usa.gov/>

**White House**  EXIT  <https://www.whitehouse.gov/>

# Ask.

**Contact EPA** <https://epa.gov/home/forms/contact-epa>

**EPA Disclaimers** <https://epa.gov/web-policies-and-procedures/epa-disclaimers>

**Hotlines** <https://epa.gov/aboutepa/epa-hotlines>

**FOIA Requests** <https://epa.gov/foia>

**Frequent Questions** <https://epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.

    

LAST UPDATED ON APRIL 28, 2022

# EXHIBIT C



An official website of the United States government
Here's how you know

**EPA** United States
Environmental Protection
Agency

MENU

Search EPA.gov

**PFOA, PFOS and Other PFAS**

CONTACT US <https://epa.gov/pfas/forms/contact-us-about-pfoa-pfos-and-other-pfas>

# Our Current Understanding of the Human Health and Environmental Risks of PFAS

---

### What EPA is Doing

Learn what EPA is doing to address PFAS. <https://epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024>

---

## Per– and Polyfluoroalkyl Substances (PFAS) Are a Group of Manufactured Chemicals

PFAS are a group of manufactured chemicals that have been used in industry and consumer products since the 1940s because of their useful properties. There are thousands of different PFAS, some of which have been more widely used and studied than others.

Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS), for example, are two of the most widely used and studied chemicals in the PFAS group. PFOA and PFOS have been replaced in the United States with other PFAS in recent years.

One common characteristic of concern of PFAS is that many break down very slowly and can build up in people, animals, and the environment over time.

## PFAS Can Be Found in Many Places

PFAS can be present in our water, soil, air, and food as well as in materials found in our homes or workplaces, including:

- **Drinking water** – in public drinking water systems and private drinking water wells.
- **Soil and water at or near waste sites** - at landfills, disposal sites, and hazardous waste sites such as those that fall under the federal Superfund and Resource Conservation and Recovery Act programs.
- **Fire extinguishing foam** - in aqueous film-forming foams (or AFFFs) used to extinguish flammable liquid-based fires.  Such foams are used in training and emergency response events at airports, shipyards, military bases, firefighting training facilities, chemical plants, and refineries.
- **Manufacturing or chemical production facilities that produce or use PFAS** – for example at chrome plating, electronics, and certain textile and paper manufacturers.
- **Food** – for example in fish caught from water contaminated by PFAS and dairy products from livestock exposed to PFAS.
- **Food packaging** – for example in grease-resistant paper, fast food containers/wrappers, microwave popcorn bags, pizza boxes, and candy wrappers.
- **Household products and dust** – for example in stain and water-repellent used on carpets, upholstery, clothing, and other fabrics; cleaning products; non-stick cookware; paints, varnishes, and sealants.
- **Personal care products** – for example in certain shampoo, dental floss, and cosmetics.
- **Biosolids** – for example fertilizer from wastewater treatment plants that is used on agricultural lands can affect ground and surface water and animals that graze on the land.

## People Can Be Exposed to PFAS in a Variety of Ways

5/31/22, 12:03 PM
Case 3:22-cv-00628-NJR   Document 28   Filed 06/01/22   Page 40 of 190   Page ID #246
Our Current Understanding of the Human Health and Environmental Risks of PFAS | US EPA

Due to their widespread production and use, as well as their ability to move and persist in the environment, surveys conducted by the Centers for Disease Control and Prevention (CDC) show that most people in the United States have been exposed to some PFAS. Most known exposures are relatively low, but some can be high, particularly when people are exposed to a concentrated source over long periods of time. Some PFAS chemicals can accumulate in the body over time.

Current research has shown that people can be exposed to PFAS by:

- Working in occupations such as firefighting or chemicals manufacturing and processing.
- Drinking water contaminated with PFAS.
- Eating certain foods that may contain PFAS, including fish.
- Swallowing contaminated soil or dust.
- Breathing air containing PFAS.
- Using products made with PFAS or that are packaged in materials containing PFAS.

# Exposure to PFAS May be Harmful to Human Health

Current scientific research suggests that exposure to high levels of certain PFAS may lead to adverse health outcomes. However, research is still ongoing to determine how different levels of exposure to different PFAS can lead to a variety of health effects. Research is also underway to better understand the health effects associated with low levels of exposure to PFAS over long periods of time, especially in children.

## What We Know about Health Effects

Current peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:

- Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.
- Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.
- Increased risk of some cancers, including prostate, kidney, and testicular cancers.

- Reduced ability of the body's immune system to fight infections, including reduced vaccine response.
- Interference with the body's natural hormones.
- Increased cholesterol levels and/or risk of obesity.

## Additional Health Effects are Difficult to Determine

Scientists at EPA, in other federal agencies, and in academia and industry are continuing to conduct and review the growing body of research about PFAS. However, health effects associated with exposure to PFAS are difficult to specify for many reasons, such as:

- There are thousands of PFAS with potentially varying effects and toxicity levels, yet most studies focus on a limited number of better known PFAS compounds.
- People can be exposed to PFAS in different ways and at different stages of their life.
- The types and uses of PFAS change over time, which makes it challenging to track and assess how exposure to these chemicals occurs and how they will affect human health.

# Certain Adults and Children May Have Higher Exposure to PFAS

## Adults

Some people have higher exposures to PFAS than others because of their occupations or where they live. For example:

- Industrial workers who are involved in making or processing PFAS or PFAS-containing materials, or people who live or recreate near PFAS-producing facilities, may have greater exposure to PFAS.
- Pregnant and lactating women tend to drink more water per pound of body weight than the average person and as a result they may have higher PFAS exposure compared to other people if it is present in their drinking water.

## Children

Because children are still developing, they may be more sensitive to the harmful effects of chemicals such as PFAS. They can also be exposed more than adults because:

- Children drink more water, eat more food, and breathe more air per pound of body weight than adults, which can increase their exposure to PFAS.
- Young children crawl on floors and put things in their mouths which leads to a higher risk of exposure to PFAS in carpets, household dust, toys, and cleaning products.

Breast milk from mothers with PFAS in their blood and formula made with water containing PFAS can expose infants to PFAS, and it may also be possible for children to be exposed in utero during pregnancy.  Scientists continue to do research in this area. Based on current science, the benefits of breastfeeding appear to outweigh the risks for infants exposed to PFAS in breast milk  EXIT  <https://www.atsdr.cdc.gov/pfas/health-effects/exposure.html>. To weigh the risks and benefits of breastfeeding, mothers should contact their doctors.

# Where to Go for the Latest Information on PFAS

| **News Releases from EPA about PFAS** |
| --- |
| Sign up to receive EPA's press releases and alerts on PFAS related topics. <https://epa.gov/newsroom> |

## Federal Government Resources

- U.S. Environmental Protection Agency (EPA) <https://epa.gov/pfas>
- Agency for Toxic Substances and Disease Registry (ATSDR)  EXIT  <https://www.atsdr.cdc.gov/pfas/index.html>
- National Institutes of Health (NIH)  EXIT  <https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm>
- Food and Drug Administration (FDA)  EXIT  <https://www.fda.gov/food/chemicals/and-polyfluoroalkyl-substances-pfas>

- United States Department of Defense (DOD)   EXIT   <https://denix.osd.mil/dod-pfas/>
- United States Navy   EXIT   <https://www.secnav.navy.mil/eie/pages/pfc-pfas.aspx>
- United States Air Force, Civil Engineering Center   EXIT   <https://www.afcec.af.mil/whatwedo/environment/perfluorinated-compounds/>

## State Government Resources

- Association of State Drinking Water Administrators (ASDWA)   EXIT   <https://www.asdwa.org/pfas/>
- Interstate Technology and Regulatory Council (ITRC)   EXIT   <https://pfas-1.itrcweb.org/>
- Environmental Council of the States (ECOS)   EXIT   <https://www.ecos.org/pfas/>
- Environmental Research Institute of the States (ERIS)   EXIT   <https://www.eristates.org/projects/pfas-risk-communications-hub/>

## Information on How to Provide Input on Proposed Government Actions

| What is a Regulation? |
|---|
| Under federal environmental laws, EPA and other federal agencies are authorized to help put those laws into effect by creating and enforcing regulations.<br><br>Regulations are mandatory requirements that can apply to individuals, businesses, state or local governments, non-profits, and others. |

Federal agencies are required to provide an opportunity for public comment when proposing a new regulation and must consider the comments in revising the proposal and issuing a final rule.  In carrying out our mission to protect human health and the environment, EPA develops regulations to prevent or to clean up hazardous chemicals released into our air, land, and water, some of which relate to PFAS.

Commenting on a proposed regulation is an important opportunity to make your voice heard. It is a way for you to provide decisionmakers with key information on any or all aspects of the proposed action, including:

- Pointing out key issues in the proposed regulation that you or your community are concerned about,
- Offering additional data and scientific evidence that may not have been considered,
- Identifying factual errors, and
- Proposing alternative solutions.

EPA's regulations will always be announced in the Federal Register and can be found at the following government websites: https://www.federalregister.gov/ EXIT <https://www.federalregister.gov/>, and https://www.regulations.gov/ EXIT <https://www.regulations.gov/>.

For some rules, EPA holds a public hearing where you can provide comments in person or remotely. The agency always accepts comments in writing. All comments – whether in person or written – get the same level of consideration. Below are additional resources to help you comment on EPA's proposed regulations related to PFAS.

- Learn how to get involved with EPA regulations <https://epa.gov/laws-regulations/get-involved-epa-regulations>.
- Read tips for submitting effective comments on EPA's proposed regulations <https://epa.gov/dockets/commenting-epa-dockets>.
- Watch a webinar on "Techniques and Skills for Providing Effective Input in the EPA Rulemaking Process." EXIT

---

PFAS Home <https://epa.gov/pfas>

---

**PFAS Explained**

---

Action steps to reduce risk <https://epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk>

---

**EPA's current understanding**

---

Increasing our understanding <https://epa.gov/pfas/increasing-our-understanding-health-risks-pfas-and-how-address-them>

---

EPA actions to address PFAS <https://epa.gov/pfas/epa-actions-address-pfas>

---

5/31/22, 12:02 AM    Our Current Understanding of the Human Health and Environmental Risks of PFAS | PFA...

Case 3:22-cv-00628-NJR    Document 28    Filed 06/01/22    Page 45 of 190    Page ID #251

PFAS Strategic Roadmap <https://epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024>

Data and Tools <https://epa.gov/pfas/pfas-resources-data-and-tools>

State Information <https://epa.gov/pfas/us-state-resources-about-pfas>

Contact Us <https://epa.gov/pfas/forms/contact-us-about-pfoa-pfos-and-other-pfas> to ask a question, provide feedback, or report a problem.



# Discover.

**Accessibility** <https://epa.gov/accessibility>

**Budget & Performance** <https://epa.gov/planandbudget>

**Contracting** <https://epa.gov/contracts>

**EPA www Web Snapshot** <https://epa.gov/utilities/wwwepagov-snapshots>

**Grants** <https://epa.gov/grants>

**No FEAR Act Data** <https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

**Plain Writing** <https://epa.gov/web-policies-and-procedures/plain-writing>

**Privacy** <https://epa.gov/privacy>

**Privacy and Security Notice** <https://epa.gov/privacy/privacy-and-security-notice>

# Connect.

**Data.gov** EXIT <https://www.data.gov/>

**Inspector General** <https://epa.gov/office-inspector-general/about-epas-office-inspector-general>

**Jobs** <https://epa.gov/careers>

**Newsroom** <https://epa.gov/newsroom>

**Open Government** <https://epa.gov/data>

**Regulations.gov** EXIT <https://www.regulations.gov/>

**Subscribe** <https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

**USA.gov** EXIT <https://www.usa.gov/>

**White House** EXIT <https://www.whitehouse.gov/>

# Ask.

**Contact EPA** <https://epa.gov/home/forms/contact-epa>

**EPA Disclaimers** <https://epa.gov/web-policies-and-procedures/epa-disclaimers>

**Hotlines** <https://epa.gov/aboutepa/epa-hotlines>

**FOIA Requests** <https://epa.gov/foia>

**Frequent Questions** <https://epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.



LAST UPDATED ON MARCH 16, 2022

# EXHIBIT D



Environ Health Perspect. 2020 Nov; 128(11): 114002.                    PMCID: PMC7657368
Published online 2020 Nov 11. doi: 10.1289/EHP7853                     PMID: 33174763
Science Selection

# Breaking It Down: Estimating Short-Chain PFAS Half-Lives in a Human Population

Wendee Nicole[✉]

## Abstract



Many studies have examined the impact of long-chain per- and polyfluoroalkyl substances (PFAS) on human health,[1] but few have looked at short-chain PFAS.[2] A recent study in *Environmental Health Perspectives* estimated half-lives of both long- and short-chain PFAS in a small group of people immediately after exposure to PFAS-contaminated drinking water ended.[3]

Case 3:22-cv-00628-NJR   Document 28   Filed 06/01/22   Page 49 of 190   Page ID #255



The same chemistry that makes PFAS so persistent in the environment also enables them to quickly extinguish fires. Firefighting foam spreads and forms a film over the fire, smothering the flames and cooling the fuel. Image: © Dushlik/Shutterstock.

The terms "long" and "short" refer to the length of the carbon (C) backbone of each molecule; long-chain is defined as perfluoroalkyl sulfonic acids with 6 or more C atoms, and perfluoroalkyl carboxylic acids with 7 or more C atoms.[4] Most long-chain PFAS have been phased out and replaced by short-chain varieties. Thus, long-chain varieties are sometimes called legacy PFAS.

It is generally believed that the shorter the chain, the shorter the half-life for PFAS.[2] However, this rapid excretion also makes it difficult to assess the health impacts of short-chain varieties because studies may start weeks or months after exposure has ceased.

"For an observational study of half-life in humans, it is crucial to find a proper population with a defined end of external exposure," says lead author Yiyi Xu, a research associate at the University of Gothenburg in Sweden. "Due to faster elimination of short-chain PFAS, researchers need to start the observation as soon as the external exposure stops, to capture reasonable serum levels for half-life estimation." Only a handful of previous studies have quantified the half-lives of short-chain PFAS in human populations.[5,6,7,8]

The new study took place at Sweden's Arvidsjaur regional airport, which has its own drinking water supply, separate from the municipality of Arvidsjaur. The airport water source was contaminated with PFAS, presumably from aqueous film-forming foam used at an on-site fire drill area. Some firefighting foams contain fluorinated surfactants and are a known source of both long- and short-chain PFAS pollution.[9]

When authorities discovered the water contamination at the airport in August 2018, they immediately provided clean water to employees and then contacted the authors of the new paper to quantify exposure levels. The researchers sampled serum and urine for 17 airport employees

starting 11–14 days after exposure ended. The municipal supply had very low levels of PFAS, which enabled the researchers to confirm that employees had no substantial exposures at home after August 2018. They used a reference population[10] from Karlshamn, a city with uncontaminated water, as a basis of comparison.

"The exposure scenario was unique in that a significant exposure source existed, and then the exposure abruptly ceased. This allowed refinement of existing half-life determinations to be more accurate," says Dana Boyd Barr, a research professor of exposure science and environmental health at Emory University who was not involved in the study. "Previous human half-life determinations haven't had this clean demarcation between exposure and exposure cessation, thus introducing more error into the calculation."

Over a period of 5 months, the team collected 4–5 blood samples and 1–4 urine samples from each participating airport employee. Long-chain PFAS accounted for 90% of total serum PFAS and 50% of the contamination in water, suggesting more bioaccumulation in the employees' bodies. At initial sampling, the highest serum PFAS was found for perfluorohexane sulfonic acid (PFHxS, C6), with concentrations 102–225 times higher than in the Karlshamn reference population. Short-chain perfluoropentane sulfonic acid (PFPeS, C5) was 175–380 times higher than in the reference population.

All serum PFAS concentrations declined over time. As expected, the half-lives of long-chain PFAS were longer than those of short-chain compounds, reaching almost 3 years in some cases. For example, the researchers estimated the average half-lives for PFHxS at 2.86 years and L-PFOS (a specific form of perfluorooctane sulfonic acid, C8) at 2.91 years. In comparison, the short-chain PFPeS had an estimated average half-life of 0.63 years, and perfluoroheptane sulfonic acid (PFHpS, C7) concentrations were 1.46 years. The shortest estimated half-lives were for perfluorobutanoic acid (PFBA, C4) at 0.12 years and perfluoroheptanoic acid (PFHpA, C7) at 0.17 years.

The investigators noted that the estimated half-lives of PFOA and PFOS were shorter than previously published estimates.[10] They also found that some isomers of PFOS had shorter half-lives than others. One possible explanation is that elimination may slow down over time once exposure ceases—a phenomenon that would be uniquely captured in this study, which started almost immediately after exposure stopped.

"The findings and toxicokinetic estimates for the PFAS analyzed were in good agreement with previous analysis and lend support for the very long biological half-lives defined for most PFAS," says Scott Belcher, a research professor of toxicology at North Carolina State University who was not involved in the study. "It is important to recognize that even the short-chain PFAS are eliminated slowly, on the order of many weeks."

Belcher adds, "The slow rates of elimination for shorter-chained PFAS, which have toxicity profiles similar to long-chain PFAS, are concerning because of the increased use of short-chain PFAS as replacements for many applications."

Case 3:22-cv-00628-NJR Document 28 Filed 06/01/22 Page 51 of 190 Page ID #257

Xu agrees. "Although short-chain PFAS are less bioaccumulative, these PFAS with the same structure of fluorine-carrying carbon chains will not degrade easily," she says. "Therefore, high short-chain PFAS contamination of drinking water is a serious environmental health problem that should be taken into account in the future."

## Biography

- 

**Wendee Nicole** is an award-winning science writer and editor based in Houston, Texas. She has written for *Discover*, *Nature*, *Scientific American*, and other publications.

## References

1. EFSA (European Food Safety Authority). 2018. Risk to human health related to the presence of perfluorooctane sulfonic acid and perfluorooctanoic acid in food. EFSA J16 (1):e05194, PMID: 32625773, 10.2903/j.efsa.2018.5194. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

2. Han X, Nabb DL, Russell MH, Kennedy GL, Rickard RW. 2012. Renal elimination of perfluorocarboxylates (PFCAs). Chem Res Toxicol 25(1):35–46, PMID: 21985250, 10.1021/tx200363w. [PubMed] [CrossRef] [Google Scholar]

3. Xu Y, Fletcher T, Pineda D, Lindh CH, Nilsson C, Glynn A, et al.. 2020. Serum half-lives for short- and long-chain perfluoroalkyl acids after ceasing exposure from drinking water contaminated by firefighting foam. Environ Health Perspect 128(7):77004, PMID: 32648786, 10.1289/EHP6785. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

4. Buck RC, Franklin J, Berger U, Conder JM, Cousins IT, de Voogt P, et al.. 2011. Perfluoroalkyl and polyfluoroalkyl substances in the environment: terminology, classification, and origins. Integr Environ Assess Manag 7(4):513–541, PMID: 21793199, 10.1002/ieam.258. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

5. Conder JM, Hoke RA, de Wolf W, Russell MH, Buck RC. 2008. Are PFCAs bioaccumulative? A critical review and comparison with regulatory criteria and persistent lipophilic compounds. Environ Sci Technol 42(4):995–1003, PMID: 18351063, 10.1021/es070895g. [PubMed] [CrossRef] [Google Scholar]

6. Olsen GW, Chang S-C, Noker PE, Gorman GS, Ehresman DJ, Lieder PH, et al.. 2009. A comparison of the pharmacokinetics of perfluorobutanesulfonate (PFBS) in rats, monkeys, and humans. Toxicology 256(1–2):65–74, PMID: 19059455, 10.1016/j.tox.2008.11.008. [PubMed] [CrossRef] [Google Scholar]

7. Russell MH, Nilsson H, Buck RC. 2013. Elimination kinetics of perfluorohexanoic acid in humans and comparison with mouse, rat and monkey. Chemosphere 93(10):2419–2425, PMID: 24050716, 10.1016/j.chemosphere.2013.08.060. [PubMed] [CrossRef] [Google Scholar]

8. Zhang Y, Beesoon S, Zhu L, Martin JW. 2013. Biomonitoring of perfluoroalkyl acids in human urine and estimates of biological half-life. Environ Sci Technol 47(18):10619–10627, PMID: 23980546, 10.1021/es401905e. [PubMed] [CrossRef] [Google Scholar]

9. Houtz EF, Higgins CP, Field JA, Sedlak DL. 2013. Persistence of perfluoroalkyl acid precursors in AFFF-impacted groundwater and soil. Environ Sci Technol 47(15):8187–8195, PMID: 23886337, 10.1021/es4018877. [PubMed] [CrossRef] [Google Scholar]

10. Li Y, Fletcher T, Mucs D, Scott K, Lindh CH, Tallving P, et al.. 2018. Half-lives of PFOS, PFHxS and PFOA after end of exposure to contaminated drinking water. Occup Environ Med 75(1):46–51, PMID: 29133598, 10.1136/oemed-2017-104651. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

# EXHIBIT E



Share This:
https://ntp.niehs.nih.gov/go/PFAS

# Per- and Polyfluoroalkyl Substances (PFAS)

Final report from the 2-Year PFOA Toxicity and Carcinogenicity Studies [TR-598](#) is now available.



## Research Overview

**Status:** Ongoing

**Substances:** [Fluorotelomer alcohol 8+2 (8:2 FTOH)](#), [Perfluorooctane sulfonic acid (PFOS)](#), [Perfluorobutane sulfonic acid (PFBS)](#), [Perfluorohexanoic acid (PFHXA)](#), [Perfluorononanoic acid (PFNA)](#), [Perfluorododecanoic acid (PFDOA)](#), [1,1,2,2-Tetrahydroperfluoro-1-dodecanol](#), [Perfluorooctanesulfonamide (PFOSA)](#), [Perfluorohexane sulfonate potassium salt (PFHSKslt)](#), [Potassium perfluorobutane sulfonate (potassium PFBS)](#), [Read More](#)

**Nominated:** September 1990; August 2003

---

### BACKGROUND INFORMATION

Per- and polyfluoroalkyl substances, or PFAS, are a large group of manufactured compounds widely used to make everyday products more resistant to stains, grease, and water. For example, these chemicals are used to keep food from sticking to cookware, make stain-resistant sofas and carpets, waterproof clothing and mattresses, and may also be used in some food packaging, as well as in some firefighting materials. Because they help reduce friction, they are also used in a variety of other industries including aerospace, automotive, building and construction, and electronics.

As a class, PFAS contains thousands of chemicals. Humans can be exposed to PFAS through a variety of ways. Ingestion—particularly through drinking water—is the main way individuals or communities are exposed, but recent studies suggest that other exposure pathways, including inhalation and skin absorption, also contribute.

---

### NTP STUDIES

NTP is studying the potential health effects of PFAS through a large research effort with multiple facets including experimental rodent and cell-based test systems, literature review, and computer modeling, among others. Taken together, these studies give insights into the potential adverse health outcomes of PFAS in the human body.

## What did the studies find?

See table below for the most up-to-date information on the variety of projects taking place at NTP.

| Study | Description | Status | Findings & Supporting Files |
|---|---|---|---|
| **Toxicology Research** | | | |
| 28-Day Toxicity Studies | Study in rats comparing toxicity of short- and long-chain carboxylates (n = 4) and sulfonates (n = 3) | Completed | **Findings:**<br><br>• Long- and short-chain PFAS affected the same organ systems—the liver and thyroid hormone<br>• Higher doses of short-chain PFAS were needed to have similar effects on liver and thyroid hormone when compared to long-chain PFAS<br><br>**Supporting files:**<br><br>• TOX Report 96: Sulfonates (2019)<br>• TOX Report 97: Carboxylates (2019)<br>• Data tables for TOX Report 96 and TOX Report 97 |

| Study | Description | Status | Findings & Supporting Files |
|-------|-------------|--------|------------------------------|
| 2-Year Toxicity and Carcinogenicity Studies | Comparison of cancer/toxicity outcomes in rats with lifetime exposure to PFOA, and those with only post-weaning exposure to PFOA | Completed | **Findings:**<br><br>• In animals exposed to PFOA either during gestation or just post-weaning, increased numbers of liver and pancreatic tumors were observed in male rats; increased pancreatic tumors were seen in female rats<br>• There was a slightly higher incidence of a rare liver tumor in male rats with lifetime exposure<br>• No differences were seen in other tissues between groups exposed to PFOA with lifetime exposure and groups with only post-weaning exposure<br><br>**Supporting files:**<br><br>• Data tables for PFOA 2-year study<br>• Technical Report 598 (2020) |

| Study | Description | Status | Findings & Supporting Files |
|---|---|---|---|
| Toxicokinetic Studies | An evaluation of chemical clearance from the body, known as toxicokinetics, for seven PFAS chemicals in rats | Ongoing | **Findings:**<br><br>• The clearance of short-chain PFAS was quicker than with long-chain PFAS<br>• PFAS concentrations were generally higher in the liver than in the brain<br><br>**Supporting files:**<br><br>• Huang et al. 2019<br>• Huang et al. 2019 (8:2 fluorotelomer alcohol)<br>• Dzierlenga et al. 2019 (Carboxylates) |

| Study | Description | Status | Findings & Supporting Files |
|-------|-------------|--------|------------------------------|
| Immunotoxicity Studies | Rat and cell-based studies to determine the potential of PFAS to impact immune system function | Completed | **Findings:**<br><br>• In rats, one type of PFAS known as PFDA had adverse effects in liver<br>• In human cell lines, exposure to PFOA and PFOS suppressed the release of a certain type of immune signaling molecule; both types of PFAS may be using a different mechanism to achieve this suppression<br><br>**Supporting files:**<br><br>• Frawley et al. 2018<br>• Corsini et al. 2012<br>• Corsini et al. 2011 |
| Neurotoxicity Studies | Cell-based studies in rat neuron-like cells to evaluate potential neurotoxicity of four PFAS | Completed | **Findings:**<br><br>• Certain PFAS could impact neurodevelopment by targeting neuron cell differentiation<br>• PFAS alterations to the cells differed among the four PFAS tested<br><br>**Supporting files:**<br><br>• Slotkin et al. 2008 |

| Study | Description | Status | Findings & Supporting Files |
|-------|-------------|--------|------------------------------|
| Mitochondrial Toxicity Studies | Cell-based studies of 16 PFAS to evaluate the potential to inhibit rat mitochondria function | Completed | **Findings:**<br><br>• The 16 PFAS tested altered mitochondrial function<br>• Long-chain PFAS were more potent than short-chain PFAS in inhibiting mitochondrial function<br><br>**Supporting files:**<br><br>• Wallace et al. 2013 |
| In Vitro & In Silico Studies | Cell-based and computational approaches to screen a range of biological responses to PFAS | Ongoing | **Supporting files:**<br><br>• PFAS studied by NTP in collaboration with EPA, Set 1<br>• PFAS studied by NTP in collaboration with EPA, Set 2<br>• Patlewicz et al. 2019 |
| **Health Effects Assessment** | | | |

| Study | Description | Status | Findings & Supporting Files |
|-------|-------------|--------|------------------------------|
| 2016 NTP Monograph | Literature-based systematic review of PFAS' impacts on the human immune system | Completed | **Findings:**<br><br>• PFOA and PFOS are immune hazards to humans based on evidence from human and animal studies<br><br>**Supporting files:**<br><br>• [Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid (PFOA) or Perfluorooctane Sulfonate (PFOS)](#) |

---

**INFORMATIONAL RESOURCES**

**Fact Sheet**

**FAQ**

**Presentations**

---

**STAY INFORMED & CONTACT US**

## Stay Informed

Subscribe to [receive email](#) to stay informed about polyfluorinated alky substances (PFAS) research and other NTP information.

## Contact Us

For questions or additional information, [email us](#) or use our [contact form](#).



---

Web page last updated on Aug. 3, 2021

NTP is headquartered administratively at the [National Institute of Environmental Health Sciences](#), part of the [National Institutes of Health](#)

# EXHIBIT F

5/31/22, 12:03 AM
Breastfeeding may expose infants to toxic chemicals | News | Harvard T.H. Chan School of Public Health

Case 3:22-cv-00628-AJB-DDL Document 28 Filed 06/01/22 Page 62 of 190 Page ID #268



# News

# Breastfeeding may expose infants to toxic chemicals



For immediate release: August 20, 2015

Boston, MA — A widely used class of industrial chemicals linked with cancer and interference with immune function—perfluorinated alkylate substances, or PFASs—appears to build up in infants by 20%–30% for each month they're breastfed, according to a new study co-authored by experts from Harvard T.H. Chan School of Public Health. It is the first study to show the extent to which PFASs are transferred to babies through breast milk, and to quantify their levels over time.

"We knew that small amounts of PFAS can occur in breast milk, but our serial blood analyses now show a buildup in the infants, the longer they are breastfed," said Philippe Grandjean, adjunct professor of environmental health at Harvard Chan School.

5/31/22, 12:05 PM
Breastfeeding may expose infants to toxic chemicals | News | Harvard T.H. Chan School of Public Health

Case 3:22-cv-00628-JLR Document 28 Filed 06/01/22 Page 63 of 190 PageID #: 260

The study appeared online August 20, 2015 in *Environmental Science & Technology*. Other study authors were from Danish universities and the Faroese Hospital System.

PFASs are used to make products resistant to water, grease, and stains. They've been in use for more than 60 years in products such as stain-proof textiles, waterproof clothing, some food packaging, paints, and lubricants, and are known to contaminate drinking water in the U.S. near various production facilities. These compounds—which tend to bioaccumulate in food chains and can persist for a long time in the body—are found regularly in the blood of animals and humans worldwide, and have been linked with reproductive toxicity, endocrine disruption, and immune system dysfunction.

The researchers followed 81 children who were born in the Faroe Islands between 1997–2000, looking at levels of five types of PFASs in their blood at birth and ages 11 months, 18 months, and 5 years. They also looked at PFAS levels in mothers of the children at week 32 of pregnancy.

They found that, in children who were exclusively breastfed, PFAS concentrations in the blood increased by roughly 20%–30% each month, with lower increases among children who were partially breastfed. In some cases, by the end of breastfeeding, children's serum concentration levels of PFASs exceeded that of their mothers'.

One type of PFAS—perfluorohexanesulfonate—did not increase with breastfeeding. After breastfeeding was stopped, concentrations of all of five types of PFASs decreased.

The results suggest that breast milk is a major source of PFAS exposure during infancy.

"There is no reason to discourage breastfeeding, but we are concerned that these pollutants are transferred to the next generation at a very vulnerable age. Unfortunately, the current U.S. legislation does not require any testing of chemical substances like PFASs for their transfer to babies and any related adverse effects," Grandjean said.

Funding for the study came from the National Institute of Environmental Health Sciences, NIH (ES012199); the U.S. Environmental Protection Agency (R830758); the

Danish Council for Strategic Research (09-063094); and the Danish Environmental Protection Agency as part of the environmental support program DANCEA (Danish Cooperation for Environment in the Arctic).

"Breastfeeding as an Exposure Pathway for Perfluorinated Alkylates," Ulla B. Mogensen, Philippe Grandjean, Flemming Nielsen, Pal Weihe, and Esben Budtz-Jørgensen, *Environmental Science & Technology*, August 20, 2015, doi: 10.1021/acs.est.5b02237

Visit the Harvard Chan School website for the latest news, press releases, and multimedia offerings.

For more information:
Marge Dwyer
mhdwyer@hsph.harvard.edu
617-432-8416

*Photo: iStockphoto.com*

\#\#\#

*Harvard T.H. Chan School of Public Health brings together dedicated experts from many disciplines to educate new generations of global health leaders and produce powerful ideas that improve the lives and health of people everywhere. As a community of leading scientists, educators, and students, we work together to take innovative ideas from the laboratory to people's lives—not only making scientific breakthroughs, but also working to change individual behaviors, public policies, and health care practices. Each year, more than 400 faculty members at Harvard Chan teach 1,000-plus full-time students from around the world and train thousands more through online and executive education courses. Founded in 1913 as the Harvard-MIT School of Health Officers, the School is recognized as America's oldest professional training program in public health.*

Share this:    Facebook    Twitter    LinkedIn    Reddit

Copyright © 2022 The President and Fellows of Harvard College

# **EXHIBIT G**


An official website of the United States government
Here's how you know

**EPA** United States
Environmental Protection
Agency

MENU

Search EPA.gov

## Assessing and Managing Chemicals under TSCA

CONTACT US <https://epa.gov/assessing-and-managing-chemicals-under-tsca/forms/assessing-and-managing-chemicals-under-tsca>

# Fact Sheet: 2010/2015 PFOA Stewardship Program

On this page:

- Q1. What is the 2010/2015 PFOA Stewardship Program?
- Q2. Why did EPA launch the PFOA Stewardship Program?
- Q3. What were the goals of the program?
- Q4. What companies participated in the PFOA Stewardship Program?
- Q5. What was the baseline that companies used for reductions?
- Q6. Did the companies meet the PFOA Stewardship Program goals?
- Q7. How did the companies meet the PFOA Stewardship Program goals?
- Q8. Are perfluorooctane sulfonic acid (PFOS), perfluorooctanoic acid (PFOA), and other long-chain PFASs still being manufactured or imported into United States?
- Q9. What other actions is EPA taking on PFASs?

## Q1. What is the 2010/2015 PFOA Stewardship Program?

In 2006, EPA invited eight major leading companies in the per- and polyfluoroalkyl substances (PFASs) industry to join in a global stewardship program with two goals:

- To commit to achieve, no later than 2010, a 95 percent reduction, measured from a year 2000 baseline, in both facility emissions to all media of perfluorooctanoic acid (PFOA), precursor chemicals that can break down to PFOA, and related higher homologue chemicals, and product content levels of these chemicals.
- To commit to working toward the elimination of these chemicals from emissions and products by 2015.

Participating companies:

- Submitted baseline data on emissions and product content at the end of October 2006.
- Reported annual progress toward goals each succeeding October and report progress in terms of both U.S. and global operations. Final reports were submitted in early 2016.
- Companies also agreed to work cooperatively with EPA and establish scientifically credible analytical standards and laboratory methods to ensure comparability of reporting.

All public documents from the PFOA Stewardship Program are available in EPA Docket EPA-HQ-OPPT-2006-0621 EXIT .

## Q2. Why did EPA launch the PFOA Stewardship Program?

EPA launched the PFOA Stewardship Program in January 2006 because of concerns about the impact of PFOA and long-chain PFASs on human health and the environment, including concerns about their persistence, presence in the environment and in the blood of the general U.S. population, long half-life in people, and developmental and other adverse effects in laboratory animals.

## Q3. What were the goals of the program?

EPA asked the eight major companies in the PFASs industry <https://epa.gov/assessing-and-managing-chemicals-under-tsca/letter-inviting-participation-pfoa-stewardship-program> to commit to reducing PFOA from facility emissions and product content by 95 percent no later than 2010, and to work toward eliminating PFOA from emissions and product content no later than 2015. Each of the eight companies expressed support for a global stewardship program addressing reductions in PFOA and related chemicals from both emissions and product content. Companies also noted their willingness to make a general commitment to continue to pursue research into the sources, pathways of exposure, and potential risks of these chemicals. All eight of the invited companies submitted commitments <https://epa.gov/assessing-and-managing-chemicals-under-tsca/letters-commiting-participation-pfoa-stewardship> to the PFOA Stewardship Program by March 1, 2006.

## Q4. What companies participated in the PFOA Stewardship Program?

Participating companies included:

- Arkema
- Asahi
- BASF Corporation (successor to Ciba)
- Clariant
- Daikin
- 3M/Dyneon
- DuPont
- Solvay Solexis

The companies participating in the PFOA Stewardship Program were global companies with business operations in United States and other countries. Under the PFOA Stewardship Program, each of the companies committed to work toward a global phaseout of PFOA and related chemicals, both for U.S. operations and for the company's global business.

## Q5. What was the baseline that companies used for reductions?

As a means of measuring reductions, the PFOA Stewardship Program Reporting Guidance suggested that individual companies use year 2000 data as the baseline for their company's emissions and product content information. Companies that did not have year 2000 data available were to use as a baseline the nearest year for which data were available. Read the PFOA Stewardship Program Guidance document. <https://epa.gov/assessing-and-managing-chemicals-under-tsca/201015-pfoa-stewardship-program-guidance-reporting>

In addition, to account for all of their operations or products, some companies used more than a single baseline year. Read the PFOA Stewardship Program Baseline Summary Tables. <https://epa.gov/assessing-and-managing-chemicals-under-tsca/pfoa-stewardship-program-baseline-year-summary-report>

## Q6. Did the companies meet the PFOA Stewardship Program goals?

All participating companies state that they met the PFOA Stewardship Program goals. Read the latest progress reports. <https://epa.gov/assessing-and-managing-chemicals-under-tsca/20102015-pfoa-stewardship-program-2014-annual-progress>

## Q7. How did the companies meet the PFOA Stewardship Program goals?

To meet the program goals, most companies stopped manufacture and import of long-chain PFASs, and then transitioned to alternative chemicals. Other companies exited the PFASs industry altogether.

Companies submitted annual public reports on their progress toward the goals in October of each successive year, expressing their progress in terms of company-wide percentage achievements both for U.S. operations and for the company's global business. Companies also provided to EPA detailed, confidential business information (CBI) on their progress in support of their public reports.

## Q8. Are perfluorooctane sulfonic acid (PFOS), perfluorooctanoic acid (PFOA), and other long–chain PFASs still being manufactured or imported into United States?

PFOS was not reported as manufactured (including imported) into the U.S. as part of the 2012 Chemical Data Reporting (CDR) effort or the previous collection effort in 2006. CDR requires manufacturers (including importers) to report if they meet certain production volume thresholds, generally 25,000 lbs at a single site. The last time PFOS manufacture was reported to EPA as part of this collection effort was 2002. There are some limited ongoing uses of PFOS (see 40 CFR §721.9582  EXIT <https://www.gpo.gov/fdsys/pkg/cfr-2014-title40-vol31/xml/cfr-2014-title40-vol31-sec721-9582.xml>).

The manufacture and import of PFOA has also been phased out in United States as part of the PFOA Stewardship program. Existing stocks of PFOA might still be used and there might be PFOA in some imported articles.

## Q9. What other actions is EPA taking on PFASs?

To complement the PFOA Stewardship Program, EPA has issued regulations, known as Significant New Use Rules (SNURs), requiring manufacturers and processors of these chemicals to notify EPA of new uses of these chemicals before they are commercialized. Specifically, the regulations require that anyone who intends to manufacture (including import) or process any chemicals for uses contained in the SNUR must submit a notification to EPA at least 90 days before beginning the activity. This provides EPA with an opportunity to review and, if necessary, place limits on manufacturers or processors who intend to reintroduce or import products with these chemicals. Learn more about EPA's actions on PFASs and other perfluorinated chemicals <https://epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas>.

Since 2000, EPA has published SNURs impacting several hundred perfluoroalkyl carboxylic acid (PFCA) and perfluoroalkane sulfonate (PFSA) chemicals.

EPA anticipates finalizing a separate SNUR later this year to ensure that PFASs phased out as part of the PFOA Stewardship Program do not re-enter the marketplace without review (see 80 FR 2885 EXIT <https://www.regulations.gov/document/epa-hq-oppt-2013-0225-0001>)

Assessing and Managing Chemicals under TSCA Home <https://epa.gov/assessing-and-managing-chemicals-under-tsca>

How EPA Evaluates the Safety of Existing Chemicals <https://epa.gov/assessing-and-managing-chemicals-under-tsca/how-epa-evaluates-safety-existing-chemicals>

Prioritizing Existing Chemicals for Risk Evaluation <https://epa.gov/assessing-and-managing-chemicals-under-tsca/prioritizing-existing-chemicals-risk-evaluation>

Risk Evaluations for Existing Chemicals <https://epa.gov/assessing-and-managing-chemicals-under-tsca/risk-evaluations-existing-chemicals-under-tsca>

Risk Management for Existing Chemicals <https://epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-existing-chemicals-under-tsca>

Contact Us <https://epa.gov/assessing-and-managing-chemicals-under-tsca/forms/assessing-and-managing-chemicals-under-tsca> to ask a question, provide feedback, or report a problem.



## Discover.

**Accessibility** <https://epa.gov/accessibility>

**Budget & Performance** <https://epa.gov/planandbudget>

**Contracting** <https://epa.gov/contracts>

**EPA www Web Snapshot** <https://epa.gov/utilities/wwwepagov-snapshots>

**Grants** <https://epa.gov/grants>

**No FEAR Act Data** <https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

**Plain Writing** <https://epa.gov/web-policies-and-procedures/plain-writing>

**Privacy** <https://epa.gov/privacy>

**Privacy and Security Notice** <https://epa.gov/privacy/privacy-and-security-notice>

## Connect.

**Data.gov** EXIT <https://www.data.gov/>

**Inspector General** <https://epa.gov/office-inspector-general/about-epas-office-inspector-general>

**Jobs** <https://epa.gov/careers>

**Newsroom** <https://epa.gov/newsroom>

**Open Government** <https://epa.gov/data>

**Regulations.gov** EXIT <https://www.regulations.gov/>

**Subscribe** <https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

**USA.gov** EXIT <https://www.usa.gov/>

**White House** EXIT <https://www.whitehouse.gov/>

## Ask.

**Contact EPA** <https://epa.gov/home/forms/contact-epa>

**EPA Disclaimers** <https://epa.gov/web-policies-and-procedures/epa-disclaimers>

EPA Disclaimers <https://epa.gov/web-policies-and-procedures/epa-disclaimers>

**Hotlines** <https://epa.gov/aboutepa/epa-hotlines>

**FOIA Requests** <https://epa.gov/foia>

**Frequent Questions** <https://epa.gov/home/frequent-questions-specific-epa-programstopics>

## Follow.

   

LAST UPDATED ON APRIL 26, 2022

# EXHIBIT H

# Authorized Uses of PFAS in Food Contact Applications

<< Per and Polyfluoroalkyl Substances (PFAS) (/food/chemical-contaminants-food/and-polyfluoroalkyl-substances-pfas)

Since the 1960s, the FDA has authorized specific PFAS for use in specific food contact applications. Some PFAS are used in cookware, food packaging, and in food processing for their non-stick and grease, oil, and water-resistant properties. To ensure food contact substances are safe for their intended use, the FDA conducts a rigorous scientific review before they are authorized for the market.

PFAS that are authorized for use in contact with food generally fall into four application categories:

- Non-stick cookware: PFAS may be used as a coating to make cookware non-stick.

- Gaskets, O-Rings, and other parts used in food processing equipment: PFAS may be used as a resin in forming certain parts used in food processing equipment that require chemical and physical durability.

- Processing aids: PFAS may be used as processing aids for manufacturing other food contact polymers to reduce build-up on manufacturing equipment.

- Paper/paperboard food packaging: PFAS may be used as grease-proofing agents in fast-food wrappers, microwave popcorn bags, take-out paperboard containers, and pet food bags to prevent oil and grease from foods from leaking through the packaging.

The FDA reviews new scientific information on the authorized uses of food contact substances to ensure that these uses continue to be safe. When the FDA identifies potential safety concerns, the agency ensures that these concerns are addressed or that these substances are no longer used in food contact applications. The FDA can work with industry to reach voluntary market phase-out agreements for such food contact substances. The FDA can also revoke food contact authorizations when the agency determines that there is no longer a reasonable certainty of no harm from the authorized use of a food contact substance.

## FDA Regulation of Food Contact Substances

The FDA conducts a rigorous scientific review before a food contact substance is authorized for market entry to ensure that it is safe for its intended use. This includes reviewing data on migration of the food contact substance into food from its intended use, expected consumer exposure to the food contact substance from its intended use and other sources of

dietary exposure including other uses authorized by FDA, and considers the potential health impact from this estimated cumulative exposure. The authorization for the use of a food contact substance requires that available data and information demonstrate a reasonable certainty of no harm for its intended use. The FDA reviews new scientific information post-authorization on food contact substances, as it becomes available, to ensure that these uses continue to be safe.

Food contact substances are generally regulated by the FDA as food additives because of their potential to migrate into food. All food additives require premarket authorization. Prior to 2000, the FDA authorized the use of food contact substances through the food additive petition process. This resulted in the publishing of regulations establishing safe conditions of use in Title 21 of the Code of Federal Regulations. Since 2000, the Food Contact Notification (FCN) program (/food/inventory-effective-food-contact-substance-fcs-notifications/about-fcs-review-program) is the primary method by which the FDA authorizes the use of food contact substances.

The Inventory of Effective Food Contact Substance (FCS) Notifications (/food/packaging-food-contact-substances-fcs/inventory-effective-food-contact-substance-fcs-notifications) is a publicly available database of all uses of food contact substances authorized through the FCN program.

## Assessing PFAS Migration Potential from Food Contact Applications

The extent to which PFAS authorized for use in food contact applications migrate to food depends on the molecular structure of the substance, how the final consumer product is manufactured, and its intended use.

- Non-stick cookware: PFAS molecules are polymerized (i.e., joined together to form large molecules) and then applied to the surface of the cookware at very high temperatures, which tightly binds the polymer coating to the cookware. This process vaporizes off virtually all the smaller (i.e., migratable) PFAS molecules. The result is a highly polymerized coating bound to the surface of the cookware. Studies show that this coating contains a negligible amount of PFAS capable of migrating to food.

- Gaskets, O-Rings, and other parts used in food processing equipment: PFAS molecules are polymerized and the resultant large molecules are further joined together (i.e. "crosslinked") to create a resin that is formed into parts such as sealing gaskets and O-rings, typically used in food processing equipment. This process removes virtually all the smaller (i.e., migratable) PFAS molecules, resulting in a negligible amount of PFAS capable of migrating to food.

- Processing aids: PFAS molecules may or may not be polymerized. However, the amount of PFAS used as processing aids in the manufacture of other food contact polymers is so small that a negligible amount of PFAS is capable of migrating to food from this use.

- Paper and paperboard food packaging: PFAS molecules are not polymerized, but rather are attached to other non-PFAS polymerized molecules as smaller "sidechains" to form the final grease-proofing agent that is applied to the paper packaging. Grease-proofing agents are applied to paper/paperboard packaging at lower temperatures, which are not high enough to remove residual smaller (i.e., migratable) PFAS molecules. Under certain conditions, the smaller PFAS "sidechain" can detach from the polymerized molecule. As a result, there may be potential for PFAS migration to food from this use.

For scientific articles from FDA researchers on PFAS migration from food packaging to food, please see the Scientific Articles section below.

## Market Phase-Out of Certain Short-Chain PFAS

Short-chain PFAS have 7 or less carbons (typically 6 carbons). This type of PFAS emerged to replace long-chain PFAS after they stopped being sold in the United States due to safety concerns in 2011. The FDA has authorized the use of certain short-chain PFAS as grease-proofing agents on food contact paper and paperboard packaging.

In the spring of 2020, the FDA published findings from our scientific review and analysis of newly available data on short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).  Our findings raised safety questions for exposure to 6:2 (FTOH) from some authorized uses of short-chain PFAS. Four manufacturers hold 15 Food Contact Notifications (FCNs) for 11 short-chain PFAS compounds that may contain 6:2 fluorotelomer alcohol (6:2 FTOH). One of the manufacturers had already informed the FDA in 2019 that it had stopped sales of its food contact substances that may contain 6:2 FTOH in the U.S. market. The three other manufacturers voluntarily agreed in July 2020 to a 3-year phase-out of their sales of these compounds for use in food contact applications in the United States, beginning in January 2021. After the 3-year period, it is anticipated that it may take up to 18 months to exhaust existing stocks of products containing these food contact substances.

As part of their commitment, they also agreed to provide the FDA with annual updates on their progress of the phase-out.  One of the manufacturers informed the FDA in its first annual update that it has permanently ceased all sales of its food contact substances that

may contain 6:2 FTOH.

The commitment letters from industry, the FDA acknowledgement letters, and the manufacturers' first annual updates are available here:

### Archroma Management

- Archroma Management GmbH Commitment Letter Regarding FCN No. 1493 (July 2020) (/media/140562/download) (PDF: 380KB)

- Acknowledgement Receipt to Archroma Management GmbH Commitment Letter Regarding FCN No. 1493 (July 2020) (/media/140610/download) (PDF: 57KB)

- Archroma Management GmbH First Annual Update Letter Regarding FCN No. 1493 (January 2022) (/media/156358/download) (PDF: 247KB)

### AGC Chemicals Americas, Inc.

- AGC Chemicals Americas, Inc Commitment Letter Regarding FCN Nos. 599, 604, 1186, and 1676 (July 2020) (/media/140561/download) (PDF: 324KB)

- Acknowledgement Receipt to AGC Chemicals Americas, Inc Commitment Letter Regarding FCN Nos. 599, 604, 1186, and 1676 (July 2020) (/media/140609/download) (PDF: 69KB)

- AGC Chemicals Americas, Inc First Annual Update Letter Regarding FCN Nos. 599, 604, 1186, and 1676 (January 2022) (/media/156356/download) (PDF: 204KB)

### Daikin America, Inc.

- Daikin America, Inc Commitment Letter Regarding FCN Nos. 820, 827, 888, 933, 1044, 1360, and 1451 (July 2020) (/media/140565/download) (PDF: 470KB)

- Acknowledgement Receipt to Daikin America, Inc Commitment Letter Regarding FCN Nos. 820, 827, 888, 933, 1044, 1360, and 1451 (July 2020) (/media/140612/download) (PDF: 85KB)

- Daikin America, Inc First Annual Update Letter Regarding FCN Nos. 820, 827, 888, 933, 1044, 1360, and 1451 (January 2022) (/media/156359/download) (PDF: 287KB)

### The Chemours Company

- The Chemours Company Commitment Letter Regarding FCN No. 940 (August 2019) (/media/140563/download) (PDF: 126KB)

- The Chemours Company Commitment Letter Regarding FCN Nos. 885 and 1027 (August 2019) (/media/140564/download) (PDF: 129KB)

- Acknowledgement Receipt to The Chemours Company Commitment Letter Regarding FCN Nos. 940, 885 and 1027 (July 2020) (/media/140611/download) (PDF: 68KB)

**Information on the Scientific Analysis of Short-Chain PFAS with 6:2 FTOH**

In the spring of 2020, the FDA published findings from our scientific review and analysis of data on 6:2 fluorotelomer alcohol (6:2 FTOH). The data raised questions about the potential human health risks from dietary exposure resulting from the authorized uses of short-chain PFAS that contain 6:2 FTOH.

The manufacturers of these short-chain grease-proofing agents had previously obtained authorization for the use of these substances in food contact paper packaging applications through the FDA's Food Contact Notification (FCN) process. At the time the FCNs for short-chain PFAS became effective, the scientific data available to the FDA showed they were a safe alternative to long-chain PFAS and did not indicate any potential for biopersistence. Subsequent studies on short-chain PFAS continued to be conducted after the FCNs became effective, and the FDA continued its analysis of these data as they became available.

The two papers published by FDA researchers in 2020 pertained to additional available information on 6:2 FTOH. The first paper described the biopersistence of 6:2 FTOH in rodents. The second paper reviewed the available data in rodents, comparing the toxicity and biopersistence of 6:2 FTOH and another short-chain -PFAS, perfluorohexanoic acid (PFHxA). PFHxA has been proposed in the scientific literature as a representative substance when assessing toxicity for some short-chain PFAS. However, many short-chain -PFAS contain 6:2 FTOH either as a constituent or an impurity or may be metabolized or converted to 6:2 FTOH. FDA's review found that 6:2 FTOH in rodents biopersists, whereas PFHxA does not, and that 6:2 FTOH is more toxic than PFHxA. As a result, the FDA concluded that 6:2 FTOH is a more representative substance in evaluating the safety of certain short-chain PFAS that contain 6:2 FTOH.

Because the data showed biopersistence of 6:2 FTOH and a higher level of toxicity compared to other types of short-chain PFAS, and because of the scientific data-gap for long-term studies on the safety of these substances, the FDA contacted the manufacturers of these substances to discuss questions on the potential human health risks. Based on the FDA's scientific review of the data and dialogue with manufacturers, there was an agreement to phase-out these short-chain 6:2 FTOH substances from the market.

For scientific articles from FDA researchers on short-chain PFAS please see the Scientific Articles section.

## Market Phase-Out and Revocation of Authorization of Long-Chain PFAS

In the early 2000s, new scientific studies raised safety questions with the types of PFAS that contain 8 or more carbon atoms in length, commonly referred to as "C8 compounds" or "long-chain" compounds. The most common types are perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS). The studies indicated that these C8 compounds persist in the environment and animal tissue and have toxic effects on humans and animals. Following FDA's analysis of these studies, the FDA worked with several manufacturers to voluntarily stop their sales of grease-proofing agents containing C8 compounds for use in food contact applications in the U.S. market.

In 2016, the FDA revoked the regulations authorizing the remaining uses of these long-chain PFAS in food packaging (see 81 FR 5, January 4, 2016 and 81 FR 83672, November 22, 2016). As of November 2016, long-chain PFAS are no longer used in food contact applications sold in the United States.

The commitment letters from industry and the FDA acknowledgement letters are available here:

### BASF Corporation

- BASF Corporation Commitment Letter Regarding FCN Nos. 59 and 255 (November 2011) (/media/127527/download)
- Acknowledgement Receipt to BASF Corporation Commitment Letter Regarding FCN Nos. 59 and 255 (June 2012) (/food/inventory-effective-food-contact-substance-fcs-notifications/letter-basf-corporation-acknowledging-receipt-voluntary-commitment-food-contact-substances)

### E.I. DuPont de Nemours & Co

- E. I. DuPont de Nemours & Co Commitment Letter Regarding FCN Nos. 206, 311, 338, and 646 (November 2011) (/media/127528/download)
- Acknowledgement Receipt to E. I. DuPont de Nemours & Co Commitment Letter Regarding FCN Nos. 206, 311, 338, and 646 (June 2012) (/food/inventory-effective-food-contact-substance-fcs-notifications/letter-e-i-dupont-de-nemours-and-company-acknowledging-receipt-voluntary-commitment-food-contact)

### Clariant Corporation

- Clariant Corporation Commitment Letter Regarding FCN No. 628 (November 2011) (/media/127529/download)

- [Acknowledgement Receipt to Clariant Corporation Commitment Letter Regarding FCN No. 628 (June 2012) (/food/inventory-effective-food-contact-substance-fcs-notifications/letter-clariant-corporation-acknowledging-receipt-voluntary-commitment-food-contact-substance)](/food/inventory-effective-food-contact-substance-fcs-notifications/letter-clariant-corporation-acknowledging-receipt-voluntary-commitment-food-contact-substance)

## Scientific Articles from FDA researchers

### Short-Chain PFAS

- [Comparative analysis of the toxicological databases for 6:2 fluorotelomer alcohol (6:2 FTOH) and perfluorohexanoic acid (PFHxA) (https://www.sciencedirect.com/science/article/pii/S0278691520300983?dgcid=coauthor)](https://www.sciencedirect.com/science/article/pii/S0278691520300983?dgcid=coauthor) ⧉ [(http://www.fda.gov/about-fda/website-policies/website-disclaimer)](http://www.fda.gov/about-fda/website-policies/website-disclaimer). (2020)

- [Characterizing Biopersistence Potential of the Metabolite 5:3 Fluorotelomer Carboxylic Acid After Repeated Oral Exposure to the 6:2 Fluorotelomer Alcohol (https://www.sciencedirect.com/science/article/pii/S0041008X20300028)](https://www.sciencedirect.com/science/article/pii/S0041008X20300028) ⧉ [(http://www.fda.gov/about-fda/website-policies/website-disclaimer)](http://www.fda.gov/about-fda/website-policies/website-disclaimer). (2020)

- [Internal exposure-based pharmacokinetic evaluation of potential for biopersistence of 6:2 fluorotelomer alcohol (FTOH) and its metabolites (https://www.sciencedirect.com/science/article/pii/S0278691518300127?via%3Dihub)](https://www.sciencedirect.com/science/article/pii/S0278691518300127?via%3Dihub) ⧉ [(http://www.fda.gov/about-fda/website-policies/website-disclaimer)](http://www.fda.gov/about-fda/website-policies/website-disclaimer). (2018)

- [C6-Perfluorianted Compounds: The New Greaseproofing Agents in Food Packaging (https://link.springer.com/article/10.1007/s40572-014-0039-3)](https://link.springer.com/article/10.1007/s40572-014-0039-3) ⧉ [(http://www.fda.gov/about-fda/website-policies/website-disclaimer)](http://www.fda.gov/about-fda/website-policies/website-disclaimer). (2015)

### PFAS Migration from Packaging to Food

- [Migration of perfluoroalkyl acids from food packaging to food simulants (https://www.ncbi.nlm.nih.gov/pubmed/23701306)](https://www.ncbi.nlm.nih.gov/pubmed/23701306). (2013)

- [Migration of fluorochemical paper additives from food-contact paper into foods and food simulants (https://www.ncbi.nlm.nih.gov/pubmed/18311629)](https://www.ncbi.nlm.nih.gov/pubmed/18311629). (2008)

- [Perfluorochemicals: Potential sources of and migration from food packaging (https://www.ncbi.nlm.nih.gov/pubmed/16227186)](https://www.ncbi.nlm.nih.gov/pubmed/16227186). (2005)

# EXHIBIT I



FDA Home[3] Food Ingredient and Packaging Inventories[4] Inventory of Food Contact Substances Listed in 21 CFR Original Search Results AMMONIUM BIS(2-(N-ETHYL(PERFLUOROOCTANE)SULFONAMIDO)ETHYL) PHOSPHATE

**Inventory of Food Contact Substances Listed in 21 CFR**

# AMMONIUM BIS(2-(N-ETHYL(PERFLUOROOCTANE)SULFONAMIDO)ETHYL) PHOSPHATE

Consult the regulation(s) cited below to see if your substance is authorized for your intended use.

| | |
|---|---|
| **CAS Reg. No. (or other ID)\*:** | 30381-98-7 |
| **Other Names:** | ♦ AMMONIUM BIS(2-(N-ETHYL(PERFLUOROOCTANE)SULFONAMIDO)ETHYL) PHOSPHATE<br>♦ AMMONIUM BIS(N-ETHYL-2-PERFLUOROOCTYLSULFONAMIDOETHYL) PHOSPHATE |
| **Food additive and GRAS regulations (21 CFR Parts 170-186):** | 176.170[5] |

**\* Definitions**

- **CAS Reg. No. (or other ID)**: Chemical Abstract Service (CAS) Registry Number® for the substance or a numerical code (other ID) assigned by CFSAN to those substances that do not have a CAS Registry Number (977nnn-nn-n series).
- **Substance**: The name of the additive as recognized by CFSAN.
- **21 CFR**: The Code of Federal Regulations, Title 21 is the preferred reference to determine the regulatory status of Indirect Food Additives. Substances whose names appear in 21 CFR, parts 175-178 are authorized for specified intended users and conditions of use as stated in the regulation. Note that substances may appear in more than one regulation, or several times in the same regulation.

Note that if a substance is mentioned in 21 CFR parts 175-178 and thus, is listed above, any other citations for the same substance in other sections of 21 CFR dealing with food additives (parts 1-199 inclusive) may also be cited.

96

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. https://www.fda.gov/food/food-ingredients-packaging/food-ingredient-and-packaging-inventories
5. http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?fr=176.170

Page Last Updated: 05/25/2022

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies

U.S. Food and Drug Administration

10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA



For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

U.S. Department of **Health & Human Services**

Links on this page:

# EXHIBIT J



FDA Home[3] Packaging & Food Contact Substances[4]Food Ingredient & Packaging Inventories[5]Inventory of Effective Food Contact Substance (FCS) Notifications

# Inventory of Effective Food Contact Substance (FCS) Notifications

The database lists effective premarket notifications for food contact substances that have been demonstrated to be safe for their intended use. The list includes the food contact substance (FCS), the notifier, the manufacturer of the FCS, the intended use, the limitations on the conditions of use for the FCS and its specifications, the effective date, and its environmental decision. Under section 409(h)(2)(C) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 348 (h)(2)(C)) a food contact substance notification (FCN) is only effective for the manufacturer or supplier identified in the notification. Persons who market a FCS based on an effective notification must be able to demonstrate that the notification is effective for their food contact substance. All persons who purchase a food contact substance manufactured or supplied by a manufacturer or supplier identified in an effective notification may rely on that notification to legally market or use the food contact substance for the use that is the subject of the notification, consistent with any limitations in that notification.

Additional information about Food Contact Substances and the definitions of Food Types and Conditions of Use[6] are available on the FCS Program page[7].

Search and display hints:

- Select the FCN number below to view the record details, including its intended use, limitations, specifications, and the Final Environmental Impact Decisions.
- To sort by a specific field, click on the column header for that field.
- To browse the records, use the Show All, First/Previous/Next/Last, and Jump To options at the bottom of the data table.
- To search for a specific substance/term, enter the term in the Search box and select Show Items to display only those records that contain the selected term. (The search results also includes terms not shown on this page, but included in the full record on the detail page.)
- The search results will return hits of records containing words that include the search term. For example, a search for the color **red** will return results that include terms such as *red*uce, ing*red*ient, and manufactu*red*. To limit results to only the searched term, place a space before and after the word in the basic search or in the advanced search "this exact phrase" field.

| **Basic Search** | **Advanced Search** | **Field Search** |
| --- | --- | --- |

**Search:** [ ] Show Items Clear

Records Found: 1596  **Show All**[8]  Page 1 of 3

| FCN No.<br>(sorted Z-A) | Food Contact Substance | Manufacturer/Supplier | Effective Date |
| --- | --- | --- | --- |
| 2212 | Tin antimony gray cassiterite (CAS Reg. No. 68187-54-2 and CAS Reg. No. 12673-86-8). | Merck KGaA, Darmstadt, Germany and its affiliated companies | Apr 26, 2022 |
| 2211 | Calcium *tert*-butylphosphonate (CAS Reg. No. 81607-35-4). | Milliken Chemical, Division of Milliken & Co. | Apr 8, 2022 |
| 2210 | An aqueous mixture of peroxyacetic acid (PAA) (CAS Reg. No. 79-21-0), hydrogen peroxide (HP) (CAS Reg. No. 7722-84-1), acetic acid (CAS Reg. No. 64-19-7), 1-hydroxyethylidine-1,1-diphosphonic acid (HEDP) (CAS Reg. No. 2809-21-4), and/or dipicolinic acid (DPA) (CAS Reg. No. 499-83-2), and optionally sulfuric acid (CAS Reg. No. 7664-93-9). | Hydrite Chemical Co. | Apr 6, 2022 |

| FCN No.<br>(sorted Z-A) | Food Contact Substance | Manufacturer/Supplier | Effective Date |
|---|---|---|---|
| 2209 | Butanedioic acid, hydroxy-, polymer with butanedioic acid, 1,4-butanediol and 2-ethyl-2-(hydroxymethyl)-1,3-propanediol (CAS Reg. No. 864132-20-7), optionally reacted with 1,6-diisocyanatohexane (CAS Reg. No. 822-06-0). | Chang Chun Plastics Company, Ltd. | Mar 24, 2022 |
| 2207 | 1-Decene, homopolymer, hydrogenated (CAS Reg. No. 68037-01-4). | BYK-Chemie GmbH | Mar 17, 2022 |
| 2206 | Chromium iron oxide (C.I. Pigment Brown 29; CAS Reg. No. 109414-04-2 and CAS Reg. No. 12737-27-8). | The Shepherd Color Company | Mar 12, 2022 |
| 2201 | Glycidyl methacrylate (CAS Reg. No. 106-91-2). | Akzo Nobel Coatings Inc. | Mar 2, 2022 |
| 2200 | Ethylene propylene copolymer (CAS Reg. No. 9010-79-1). | ExxonMobil Chemical Company and its stewarded affiliates around the world | Feb 25, 2022 |
| 2199 | Ethylene propylene copolymer (CAS Reg. No. 9010-79-1). | ExxonMobil Chemical Company and its stewarded affiliates around the world | Feb 25, 2022 |
| 2198 | Hypochlorous acid (CAS Reg. No. 7790-92-3). | Bioionix, Inc. | Apr 28, 2022 |
| 2197 | N,N'-dioleoylethylenediamine (CAS. Reg. No. 110-31-6). | SK Functional Polymer S.A.S. | Feb 19, 2022 |
| 2195 | Amorphous silicon dioxide coating ($SiO_xC_yH_z$) made using plasma-enhanced chemical vapor-depositionof hexamethyldisiloxane. | Comotomo, Inc. | Apr 9, 2022 |
| 2194 | 1-Propanesulfonic acid, 2-methyl-2-[(1-oxo-2-propen-1-yl)amino]-, sodium salt (1:1), polymer with 2-propenamide, reaction products with glyoxal (CAS Reg. No. 2614959-08-7). | SNF SA<br>SNF Inc. | Apr 6, 2022 |
| 2191 | 2-Propenoic acid, 2-methyl-, 2-(dimethylamino)ethyl ester, polymers with 2-(C16-18-acylamino)ethyl acrylate and 4-hydroxybutyl acrylate, acetates (salts) (CAS Reg. No. 2374117-56-1). | Daikin America, Inc. | Feb 1, 2022 |
| 2188 | Hypochlorous acid (CAS Reg. No. 7790-92-3). | Clarentis Technologies LLC | Apr 5, 2022 |
| 2187 | 1,2-Bis(3,5-di-tert-butyl-4-hydroxyhydrocinnamoyl)hydrazine (CAS Reg. No. 32687-78-8). | Songwon Industrial Co., Ltd. | Jan 22, 2022 |
| 2186 | Hypochlorous acid (CAS Reg. No. 7790-92-3). | Clarentis Technologies LLC | Apr 26, 2022 |
| 2184 | Siloxane and Silicones, di-Me, Me hydrogen polymers with di-Me, Me vinyl siloxanes, 1,1'-(1-methylethylidene)bis[4-(2-propen-1-yloxy)benzene]-2,4,6,8-tetramethylcyclotetrasiloxane reaction products, vinyl group-terminated di-Me siloxanes and hydrogen-terminated di-Me siloxanes. | Shin-Etsu Chemical Co., Ltd. | Mar 15, 2022 |
| 2183 | Bis(4-tert-butylbenzoate-O)hydroxyl aluminum (CAS. Reg. No. 13170-05-3). | Shandong Rainwell New Materials Technology Company, Ltd. | Mar 10, 2022 |
| 2181 | 1,3-Benzenedicarboxylic acid, polymer with 1,3-benzenedimethanamine and hexanedioic acid (CAS Reg. No. 28628-75-3). | Mitsubishi Gas Chemical Co., Inc. | Mar 23, 2022 |
| 2180 | Methacrylic acid, polymer with cyclohexyl methacrylate, 2-ethylhexyl acrylate, itaconic acid, acrylamide tert-butylsulfonic acid, acrylamide, and acrylic acid, sodium salt. | SEIKO PMC Corporation | Dec 18, 2021 |
| 2178 | 1,4-Benzenedicarboxylic acid, polymer with 1,2-ethanediol and octahydro-4,7-methano-1H-indene5,?-dimethanol (CAS Reg. No. 106127-84-8), optionally cross-linked with ≤0.15 wt.-% glycerin. | Chang Chun Plastics Co., Ltd. | Oct 13, 2021 |

| FCN No. (sorted Z-A) | Food Contact Substance | Manufacturer/Supplier | Effective Date |
|---|---|---|---|
| 2176 | Phenol, 4,4'-sulfonylbis-, polymer with 1,1'-sulfonylbis(4-chlorobenzene) (CAS Reg. No. 25667-42-9 and 25608-63-3). | Sumitomo Chemical Co., Ltd. | Dec 7, 2021 |
| 2175 | Poly(acrylic acid-co-ethyl acrylate-co-glycidyl methacrylate-co-styrene) (CAS Reg. No. 27968-38-3). **REPLACES FCN 1212** | PPG Industries, Inc. | Dec 3, 2021 |
| 2174 | Cross-linked 2-propenoic acid, homopolymer, sodium salt (CAS Reg. No. 9003-04-7). | Pactiv LLC | Nov 30, 2021 |
| 2173 | Quino[2,3-b]acridine-7,14-dione,5,12-dihydro-2,9-dimethyl-, also known as dimethylquinacridone and C.I. Pigment Red 122 (CAS Reg. No. 980-26-7). | DIC Corporation | Jan 15, 2022 |
| 2171 | An aqueous mixture of peroxyacetic acid (PAA) (CAS Reg. No. 79-21-0), hydrogen peroxide (HP) (CAS Reg. No. 7722-84-1), acetic acid (AA) (CAS Reg. No. 64-19-7), 1-hydroxyethylidine-1,1-diphosphonic acid (HEDP) (CAS Reg. No. 2809-21-4), dipicolinic acid (DPA) (CAS Reg. No. 499-83-2), and optionally sulfuric acid (SA) (CAS Reg. No. 7664-93-9). | Evonik Active Oxygens, LLC | Dec 23, 2021 |
| 2169 | 1,6-hexanediol (CAS Reg. No. 629-11-8). | National Coatings, Inc. | Oct 26, 2021 |
| 2168 | An aqueous mixture of peroxyacetic acid (PAA) (CAS Reg No 79-21-0), hydrogen peroxide (HP) (CAS Reg No 7722-84-1), acetic acid (CAS Reg No 64-19-7), dipicolinic acid (DPA) (CAS Reg No 499-83-2), and optionally sulfuric acid (CAS Reg No 7664-93-9). | Enviro Tech Chemical Services, Inc. | Oct 19, 2021 |
| 2165 | An aqueous solution of hydrogen peroxide (CAS Reg. No. 7722-84-1). | Cargill, Inc. | Oct 8, 2021 |
| 2164 | Niobium-doped titanium dioxide, coated with calcium titanate | Merck KGaA, Darmstadt, Germany and its affiliated companies | Oct 6, 2021 |
| 2162 | Styrene block polymer with 1,3-butadiene, hydrogenated (CAS Reg. No. 66070-58-4) as further described in your submission. | Kuraray Co., Ltd. Kuraray America, Inc. Kuraray Europe GmbH Kuraray GC Advanced Materials Co., Ltd. | Dec 11, 2021 |
| 2161 | Hypochlorous acid (CAS Reg. No. 7790-92-3). | Ecolab, Inc. | Sep 29, 2021 |
| 2160 | 2-propenoic acid, polymer with sodium phosphinate (1:1), neutralized with calcium and sodium (CAS Reg. No. 2144395-83-3). | BASF | Sep 18, 2021 |
| 2159 | [1,1-Biphenyl]-4,4-diol, polymer with 1,1-sulfonylbis[4-chlorobenzene] (CAS Reg. No. 25608-64-4 and 25839-81-0). | Chang Chun Plastics Co., Ltd. | Nov 12, 2021 |
| 2158 | Quino[2,3-b]acridine-7,14-dione, 5,12-dihydro-2,9-dimethyl-, also known as 2,9-dimethylquinacridone and C.I. Pigment Red 122 (CAS Reg. No. 980-26-7). | Trust Chem Co., Ltd. | Sep 14, 2021 |
| 2157 | Decanedioic acid, polymer with 2-ethyl-2-(hydroxymethyl)-1,3-propanediol, isooctadecanoate (CAS Reg. No. 2294927-19-6). | OLEON NV | Sep 10, 2021 |
| 2156 | Copolymer of acrylonitrile, methacrylonitrile, methyl methacrylate, methacrylic acid, and trimethylolpropane trimethacrylate (CAS Reg. No. 1173902-42-5). | Tapi S.p.A. | Nov 6, 2021 |
| 2154 | 2-propenoic acid, polymer with sodium phosphinate (1:1), neutralized with sodium, calcium, and/or magnesium (including CAS Reg. No. 129898-01-7 (Na salt), CAS Reg. No. 935545-65-6 (Mg Na salt), and CAS Reg. No. 2144395-83-3 (Ca Na salt)). | SNF SA, SNF Inc. | Nov 9, 2021 |
| 2153 | 5-Chloro-2-methyl-4-isothiazolin-3-one (CIT; CAS Reg. No. 26172-55-4). | THOR GmbH | Nov 17, 2021 |
| 2149 | Alcohols, C16-18, ethoxylated (CAS Reg. No. 68439-49-6). | Cytec Industries Inc. | Sep 29, 2021 |

| FCN No.<br>(sorted Z-A) | Food Contact Substance | Manufacturer/Supplier | Effective Date |
|---|---|---|---|
| 2148 | Magnesium sodium fluoride silicate (CAS Reg. No. 56450-90-9). | Topy Industries, Limited | Jul 31, 2021 |
| 2147 | Styrene block polymer with 1,3-butadiene, hydrogenated (CAS Reg. No. 66070-58-4). **REPLACES FCN 2063** | TSRC Corporation | Sep 25, 2021 |
| 2142 | Copolymer of styrene (CAS Reg. No. 100-42-5), methyl methacrylate (CAS Reg. No. 80-62-6), and glycidyl methacrylate (CAS Reg. No. 106-91-2). **REPLACES FCNs 853 AND 1109** | BASF Corporation | Jul 22, 2021 |
| 2141 | Poly(2-ethyl-2-oxazoline) (CAS Reg. No. 25805-17-8). | Solenis LLC | Aug 21, 2021 |
| 2139 | Zinc pyrithione (CAS Reg. No. 13463-41-7) **REPLACES FCN 2031** | Symphony Environmental Technologies Plc | Jul 13, 2021 |
| 2138 | Polyethylene terephthalate copolyesters (diethylene glycol-isophthalate modified) prepared by the condensation of dimethyl terephthalate or terephthalic acid and ethylene glycol with one or more of the following: dimethyl isophthalate, isophthalic acid, and diethylene glycol. | M&G Polímeros México, S.A. de C.V. | Jul 10, 2021 |
| 2137 | Chromium nitride. | IKEA of Sweden AB | Jul 7, 2021 |
| 2136 | Polyethylene terephthalate-azelate copolyester resin (CAS Reg. No. 25609-72-7). | DuPont Teijin Films | Jul 6, 2021 |
| 2135 | 1,4-butanediol-polytetramethylene glycol-dimethyl terephthalate block copolymer (CAS Reg. No. 106465-17-2), reaction products with maleic anhydride. | Mitsubishi Chemical Corporation | Sep 4, 2021 |

**Show All**[9]

First Previous **Next Last**

jump to page  1  ⌄  of 32

Quick Links:

- Packaging & Food Contact Substances (FCS)[10]
- Food Types and Conditions of Use[11]
- Environmental Decisions[12] and Inventory of Environmental Impact Decisions for Food Contact Substance Notifications[13]

96

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. https://www.fda.gov/food/food-ingredients-packaging/packaging-food-contact-substances-fcs
5. https://www.fda.gov/food/food-ingredients-packaging/food-ingredient-and-packaging-inventories
6. https://www.fda.gov/food/packaging-food-contact-substances-fcs/food-types-conditions-use-food-contact-substances
7. https://www.fda.gov/food/food-ingredients-packaging/packaging-food-contact-substances-fcs
8. /scripts/fdcc/index.cfm?set=FCN&sort=FCN_No&order=DESC&showAll=true&type=basic&search=

9. /scripts/fdcc/index.cfm?
   set=FCN&sort=FCN_No&order=DESC&showAll=true&type=basic&search=

10. https://www.fda.gov/food/food-ingredients-packaging/packaging-food-contact-substances-fcs

11. https://www.fda.gov/food/packaging-food-contact-substances-fcs/food-types-conditions-use-food-contact-substances

12. https://www.fda.gov/food/food-ingredients-packaging/environmental-decisions

13. https://www.cfsanappsexternal.fda.gov/scripts/fdcc/?set=ENV-FCN

Page Last Updated: 04/30/2022

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies



U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA



For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

U.S. Department of Health & Human Services

**Links on this page:**

# EXHIBIT K

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| KEN MCDOWELL, individually and on behalf of all others similarly situated, | ) ) ) Case No.: |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| MCDONALD'S CORPORATION, | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Ken McDowell ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant McDonald's Corporation ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this Class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's Big Mac (the "Product"), which is unfit for human consumption because the packaging in which it is contained—and is essential and integral to delivering the Product to the consuming public[1]— contains unsafe per- and polyfluoralkyl substances ("PFAS").[2]

---

[1] Due to the integral and essential nature of the packaging, the term "Product" is used herein to denote both the Product and the Product's packaging.

[2] Discovery may reveal that additional McDonald's products are within the scope of this Complaint. Accordingly, Plaintiff reserves the right to include additional food products identified throughout the course of discovery.

2.      PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[3]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[4]

4.      Despite Defendant's representations to consumers that their products are "safe,"[5] and "sustainable,"[6] including in its website and the Product packaging—which is an essential and integral part of delivering the Product to consumers—independent research conducted by Consumer Reports[7] determined that the Product packaging—which is an essential and integral part

---

[3] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.

[4] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last visited Mar. 30, 2022).

[5] *See, e.g.*, McDonald's, "Our Food Philosophy," https://www.mcdonalds.com/us/en-us/about-our-food/our-food-philosophy.html (last visited Mar. 30, 2022) ("At McDonald's . . . [w]e take great care that what we serve every day is safe, great quality, offers choice and is produced in a responsible way.").

[6] *See, e.g.*, McDonald's, "Packaging & Waste," https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/our-planet/packaging-and-waste.html (last visited Mar. 30, 2022) ("Meeting Customer Expectations of Convenience, Safety and Sustainability . . . Together with our Franchisees, suppliers and industry partners, we invest in research and development of new materials and packaging designs that fit our customers' needs for convenience, food safety and sustainability.").

[7] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited Mar. 30, 2022).

of delivering the Product to consumers—contains **195.3 parts per million (ppm) of total organic fluorine**."[8]

5.      As a point of reference, the current EPA health advisor limit for safe consumption, is just **70 nanograms per liter**.[9]  To put this in perspective, **1 part per million is the equivalent of 1,000,000 nanograms per liter**.[10]  Accordingly, the Product would expose a consumer to PFAS at levels that are several orders of magnitude higher than one would receive from drinking a liter of water that contains PFAS at the level considered safe by the EPA.

6.      This particularly worrisome in the context of Defendant's packaging for the Product, which emphasizes its sustainable nature in substantially similar to the following manner:





---

[8] According to Toxin Free USA, "organic fluorine results identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources."  *See GMO Free v. CoverGirl Cosmetics, et al.*, Case No. 2021-CV-0046786B (D.C. Super. Dec. 20, 2021), Docket No. 1, ¶¶ 30-31.

[9] Duke University, Nicholas School of the Environment, "High Levels of PFAS Found in Anti-Fogging Sprays and Cloths," (Jan. 5, 2022), https://nicholas.duke.edu/news/high-levels-pfas-found-anti-fogging-sprays-and-cloths (last visited Mar. 30, 2022).

[10] JustinTOOLS, "Density Units Conversion parts-per-million to nanograms-per-liter," https://www.justintools.com/unit-conversion/density/php?k1=parts-per-million&k2=nanograms-per-milliliter (last visited Mar. 30, 2022).

7.     The use of the Forest Stewardship Counsel's ("FSC") label serves to assure consumers that the Product packaging is sustainable and can trusted.  As the FSC notes, "[s]een on thousands of product labels around the world, the FSC trademark—most recognizably the famous FSC logo—are trusted by ethical consumers worldwide."[11]  The FSC further notes

8.     In fact, the FSC further notes that the FSC logo may be used to "show[] sustainable credentials to your buyers."[12]  As a user of the FSC logo, Defendant undoubtedly is aware of the importance that consumers attach to it.

9.     Thus, based on Defendant's representations, a reasonable consumer would expect that the Product can be safely purchased and consumed as marketed and sold.  However, the Product is not safe, posing a significant health risk to unsuspecting consumers.  Nor is the Product sustainable.  Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiff that their Product is unsafe and harmful to the environment, contains heightened levels of PFAS, or should otherwise be approached with caution.

10.     Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all other similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, et seq. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, et seq.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had And Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation;

---

[11] Forest Stewardship Counsel, "How to Use the FSC Logo," https://fsc.org/en/for-businesses/use-our-logo (last visited Mar. 30, 2022).

[12] *Id.*, "Who can use the FSC trademarks?"

(12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; and (14) Negligent Failure to Warn.

## **THE PARTIES**

11.     Plaintiff Ken McDowell is a natural person and citizen of California who resides in San Rafael, California.  Plaintiff McDowell has purchased the Product from Defendant for several years, including as recently as March 2022 from a McDonald's located in San Rafael, California. Prior to his purchase, Mr. McDowell reviewed the labeling, packaging, and marketing materials of his Product, including those set out herein, including that the Product was safe and sustainable. Mr. McDowell understood that based on Defendant's claims, that Product was safe for consumption, and otherwise a sustainable product.  Mr. McDowell reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. McDowell suffered and continues to suffer, economic injuries.

12.     Mr. McDowell continues to desire to purchase the Product from Defendant. However, Mr. McDowell is unable to determine if the Product is actually safe and sustainable. Mr. McDowell understands that the composition of the Product may change over time.  But as long as Defendant continues to markets its products as "safe" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's Products.  Mr. McDowell is further likely to be repeatedly misled by Defendant's conduct, unless and until

Defendant is compelled to ensure that the Product is marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

13.     Defendant McDonald's Corporation ("Defendant") is a Delaware corporation with its principal place of business located in Chicago, Illinois.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

15.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District, and the acts and transactions giving rise to this action occurred in this District.

16.     This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District and because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Food And Consumer Preferences

17.     According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[13]  Consumers

---

[13] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited Mar. 30, 2021).

ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[14]

18.      At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[15]

19.      These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[16]

20.      Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[17]

21.      Thus, there is enormous incentive for companies such as Defendant to market their products as safe and sustainable.  Indeed, Defendant has repeatedly and pervasively touted these considerations as reasons to purchase the Product over competitors.  Examples of these representations are included below.

22.      These include statements made directly on Defendant's website such as "From the start, we've been committed to doing the right thing.  And every day, all around the globe, we put

---

[14] *Id.*

[15] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-conent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).

[16] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage-processors/ (last visited Mar. 22, 2022).

[17] Made Safe, "What Shoppers Want," at 3.

people, processes and practices into place to make quality food, more responsible sourcing choices, a stronger community and a better planet."[18]

23.    Defendant states on its website that "[f]rom minimizing how much packaging we use to investing and partnering to advance sustainable and regenerative agricultural practices – we want to help protect our planet for communities today and in the future."[19]

24.    Defendant prominently quotes its Executive Vice President, Francesca DeBiase, on its website as stating "'To secure a thriving food system for the future, the food industry has an opportunity—and a responsibility—to help mitigate the impacts of climate change and find more sustainable ways to feed people.'"[20]

25.    Defendant states on its website that its "Packaging helps us serve food quickly and safely to our customers."[21]

26.    Defendant states on its website that "Providing safe food is our number one priority and a responsibility that we take seriously."[22]

27.    Defendant states on its website that "To do this, McDonald's renewed and refreshed our Global Food Safety Strategy in 2019, which ensures we integrate food safety into the design of food [and] packaging[.]"[23]

---

[18] McDonald's, "Values in Action," https://www.mcdonalds.com/us/en-us/about-us/values-in-action.html (last visited Mar. 30, 2022).

[19] McDonald's "Our Planet," https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/our-planet.html (last visited Mar. 30, 2022).

[20] *Id.*

[21] McDonald's, "Climate Risk & Resiliency Summary 2021," https://corporate.mcdonalds.com/content/dam/gwscorp/assets/our-planet/climate-action/McDonalds-2021-Climate-Risk-and-Resiliency-Summary.pdf at 10 (last visited Mar. 30, 2022).

[22] McDonald's, "Food Safety, https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/food-quality-and-sourcing/food-safety.html (last visited Mar. 30, 2022).
[23] *Id.*

28.    Defendant states on its website that "We believe food safety should be a key consideration for every company in our industry[.]"[24]

29.    Defendant has amplified this ethos in its packaging, which, as Defendant notes, "lives seamlessly with the brand identity, as they were created in parallel over the course of four years.  The point-of-view and principles hold true across every menu item to make way for a cohesive system[.]"[25]

30.    Thus, when consumers, like Plaintiff interact with Defendant's packaging, they expect it to embody Defendant's brand, which as noted above, has continuously emphasized safety and sustainability.

31.    And Defendant's recognized this in its report to investors immediately following the rebrand, noting that "From time to time, we have reinvigorated our values to stay responsive to the changing needs of our customers.  In 2020, we did just that – clarifying what guides us and what we stand for to make the values of this Brand as clear, concise and relevant to today as possible."[26]

32.    Defendant noted that this rebrand was reflected in Food Quality and Sourcing, stating that "The safety and quality of our food is a top priority, and we are constantly innovating the strive to meet and exceed our customers' expectations."[27]

---

[24] *Id.*

[25] Packaging Europe, "The inside story of the McDonald's packaging rebrand," (Mar. 11, 2021), https://packagingeurope.com/the-inside-story-of-the-mcdonalds-packaging-rebrand/347.article (last visited Mar. 30, 2022).

[26] McDonald's 2021 Notice of Annual Shareholder's Meeting and Proxy Statement, at 7, https://corporate.mcdonalds.com/content/dam/gwscorp/assets/investors/2021%20Proxy%20Statement.pdf (last visited Mar. 30, 2022).

[27] *Id.* at 10.

33.     However, as described in the next section, Defendant's Product is not safe for consumption, and poses a critical risk to the safety and health of consumers.

**B.      PFAS In Food Packaging Is Harmful To Humans And The Environment**

34.     Consumer Reports' study followed the 2018 groundbreaking research conducted by Toxic Free Future, which first detected PFAS in the Product packaging.[28]

35.     Nonetheless, more than three years later, Consumer Reports revealed that PFAS had not been removed from the Product packaging.  That results of that research is set out below:

## McDonald's

| | | |
|---|---|---|
| Bag for french fries | ■ ■ | 250.3 |
| Bag for cookies | ■ ■ | 250.0 |
| Bag for Chicken McNuggets | ■ ■ | 219.0 |
| Container for Big Mac | ■ ■ | 195.3 |
| Wrapper for double cheeseburger | | 15.0 |
| Container for Chicken McNuggets | | 13.5 |
| Container for french fries | | 7.5 |
| Wrapper for Egg McMuffin | | 7.0 |
| Wrapper for McChicken sandwich | | ND |

---

[28] Jen Dickman, *et al.* "Packaged in Pollution: Are food chains using PFAS in packaging?" https://toxicfreefuture.org/packaged-in-pollution/ (last visited Mar. 30, 2022).

36.     The reason companies like Defendant use PFAS in their food packaging products is simple: the coating acts "as a barrier to keep grease from escaping" and "from leaking into people's hands."[29]

37.     But PFAS are not necessary for this intended outcome.  Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no detectable levels of organic fluorine.[30]  Accordingly, Defendant would have had knowledge that they could product the Product packaging without the heightened levels of PFAS inherent in its current composition.

38.     Yet, Defendant chose not to, and instead concealed this information from consumers, to increase by the cost savings associated with using these chemicals.

39.     This has not been without consequences for consumers, as PFAS in food packaging migrates[31] onto the food, exposing consumers to PFAS via ingestion.[32]

40.     Worryingly, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which make them highly persistent both in the environment and in human bodies.

41.     That these substances are harmful to the human body is beyond dispute.  In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology

---

[29]Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last visited Mar. 30, 2022).

[30] *See supra* n. 27 and *supra* n. 6.

[31] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784

[32] *See* Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, https://ntp.niehs.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last visited Mar. 30, 2022).

Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[33]

      42.    A figure from the European Environmental Agency ("EEA") shows that "effects of PFAS on human health:"[34]



      43.    The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[35]

---

[33] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last visited Mar. 30, 2022).

[34] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.edu/publications/emerging-chemicals-risks-in-europe (last visited Mar. 30, 2022).

[35] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS," https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Mar. 30, 2022).

44.     In total, this research demonstrates that the risk of severe complications arising from exposure to PFAS is both credible and substantial.

45.     The harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated in the figure below:[36]



46.     Once introduced, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears.[37]  Often making their way to dinner tables of people who did not even purchase the Product.[38]

### C.     Defendant's Misrepresentation and Omissions Are Actionable

47.     Plaintiff and the Class were injured by the full purchase price of the Product because the Product is worthless, as it is marketed as safe and sustainable when it is not in fact safe and sustainable.

---

[36] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Mar. 30, 2022).

[37] *Id.*

[38] *Id.*

48.     Plaintiff and Class Members bargained for products that are safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them a product in packaging containing dangerous substances with well-known health and environmental consequences.

49.     No reasonable consumer would expect that a product marketed as safe and sustainable would pose a risk to their health, safety, and wellbeing, or that it would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans and the environment.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

50.      As the Product exposes consumers to PFAS that pose a risk to consumers' health, the Product is not fit for consumption by humans.  Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to high levels of toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

51.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Product and to disclose that the Product contained substances known to have adverse health effects.   Nonetheless, Defendant concealed and affirmatively misrepresented the Product, as discussed herein.

52.     Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the PFAS and its failure to disclose the existence of PFAS in the Product to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

53. **WHO**: Defendant made material misrepresentations and/or omissions of fact about the Product through its labeling, website representations, and marketing statements, which include the statements that the Product is safe and sustainable. These representations constitute omitted material information regarding harmful chemicals in the Product packaging which is essential and integral to delivering the Product to the consumer.

54. **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because they omitted and concealed that the Product contains substances—PFAS—that are widely known to have significant health repercussions. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Product is safe and sustainable, when it is not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner.

55. **WHEN**: Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Product, despite its knowledge that the Product packaging contained harmful substances.

56. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Product's packaging, website, and through marketing materials.

57. **HOW**: Defendant made material misrepresentations and/or failed to disclose material facts regarding the Product, including the presence of PFAS.

58. **WHY**: Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers

to purchase and/or pay for the Product, the effect of which was that Defendant profited by selling the Product to hundreds of thousands of consumers.

59.     **INJURY**:  Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

60.     Defendant would have had actual knowledge for years that the Product packaging contains harmful chemicals such as PFAS.

61.     Although Defendant was aware of the deception in its labeling given the inclusion of PFAS in the Product despite claims of the Product's safety and sustainability, they took no steps to warn Plaintiff or Class Members of risks related to PFAS in the Product.

62.     Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Product.  Defendant had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product.

63.     Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Product is safe and sustainable.

64.     Defendant concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Product.  Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.  Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

65.     The PFAS included in the formulation, design and/or manufacture of the Product packaging were not reasonably detectible to Plaintiff and Class Members.

66.     At all times, Defendant actively and intentionally concealed the existence of the PFAS and failed to inform Plaintiff or Class Members of the existence of the PFAS.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

67.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Product packaging contained harmful chemicals.

68.     Defendant concealed or misrepresented the PFAS for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

69.     As a result of Defendant's active concealment of the PFAS and/or failure to inform Plaintiff and Class Members of the PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Product.

70.     Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Product contained PFAS, which, at the very earliest, would have been in March 2022.  Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS until after the widely publicized Consumer Report's study.  Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of PFAS in the Product and of the Product's true nature.

## CLASS ALLEGATIONS

71.     Plaintiff brings this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Product (the "Class").  Excluded from the Class are persons who made such purchases for purposes of resale.

72.     Plaintiff also seeks to represent a subclass of all Class Members who purchased the Product in the State of California (the "California Subclass").  Excluded from the California Subclass are persons who made such purchases for purpose of resale.

73.     As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

74.     At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members").  However, given the nature of the claims and the number Defendant's restaurants in the United States selling Defendant's Product, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

75.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to Class Members predominate over questions that may affect individual Class Members include:

(a)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

(b)     whether Defendant's conduct was unfair and/or deceptive;

(c)     whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

(d)     whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

76.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act as well as the California Unfair Competition Law.

77.     Plaintiff's claims are typical of those of the Class because Plaintiff, like all Class Members, purchased, in a typical consumer setting, Defendant's Product, and Plaintiff sustained damages from Defendant's wrongful conduct.

78.     Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

79.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

**COUNT I**
**(Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**

80.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

81.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

82.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

83.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

84.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Berverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

85.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers. In addition,

20

Defendant have committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

86.     Plaintiff and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

87.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

88.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

89.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

90.     Plaintiff and the other California Subclass Members suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

91.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

92.     Plaintiff and the other California Subclass Members had no way of reasonably knowing that the Product they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

93.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other California Subclass Members.

94.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

### COUNT II
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),
California Civil Code § 1750, *et seq.*)
(Injunctive Relief Only)**

95.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

96.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

97.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

98.     Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

99.     Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

100.    Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as safe and sustainable, when in fact the Product is not safe, dangerous, and useless.

101.    The Product is not safe because they contain an extraordinary level of PFAS in the packaging which is essential and integral to the delivery of the Product to consumers that subject unsuspecting consumers to significant health risks.

102.    Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiff or California Subclass Members.

103.    Defendant made partial representations to Plaintiff and California Subclass Members, while suppressing the true nature of the Product. Specifically, by displaying the Product and describing the Product as safe and sustainable, including on the product packaging, on its website, and in its marketing, without disclosing that the Product was unsafe and detrimental to human health and the environment. As described above, Defendant was in receipt of knowledge pertaining to PFAS in their Product and yet for a period of several years has continued to Product. Moreover, Defendant affirmatively misrepresented the Product despite its knowledge that the Product was not as advertised.

104.    Plaintiff and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

105.     On March 30, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that tit was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Because of the gravity of the harm alleged, Plaintiff has chosen not to wait for Defendant's response.  Plaintiff has also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein. Accordingly, Plaintiff's letter would not have served the purpose of the letter.

106.     Accordingly, Plaintiff and the California Subclass Members seek injunctive relief available under the CLRA.  Should Defendant choose not to remedy the situation within 30 days of the letter, Plaintiff reserves the right to amend his complaint for damages and reasonable attorney's fees.

### COUNT III
**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

107.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

108.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

109.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the

manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

110.     The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

111.     Plaintiff and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

112.     Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Product to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

113.     Defendant impliedly warranted to retailer buyers that the Product was merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Product is used.  For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements.  Defendant breached these implied warranties because the Product was unsafe for consumption.  Therefore, the Product would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

114.     Plaintiff and California Subclass Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

115.     The Product was not altered by Plaintiff or the California Subclass Members.

116.     The Product was defective at the time of sale when they it the exclusive control of Defendant.  The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

117.    Defendant knew that the Product would be purchased and used without additional testing by Plaintiff and Class Members.

118.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that they were unfit for use and posed a significant safety risk.

119.    Plaintiff and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

**COUNT IV**
**(Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq*.)**

120.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

121.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

122.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Product as safe and sustainable when, in fact, the Product was not safe and not sustainable.

123.    By its actions, Defendant disseminated uniform advertising regarding the Product to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

124.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the

Product contains substances that pose a significant risk to the health and wellbeing of Plaintiff and the Subclass Members as well as to the environment.

125.    Defendant continues to misrepresent to consumers that the Product was safe and sustainable.  However, as described, this is not the case.

126.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other Class Members based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiff and Class Members were injured in fact and lost money and property as a result.

127.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

128.    As a result of Defendant's wrongful conduct, Plaintiff and Class Members lost money in an amount to be proven at trial.  Plaintiff and Class Members are therefore entitled to restitution as appropriate for this cause of action.

129.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

### COUNT V
#### (Fraud)

130.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

131.    Plaintiff brings this claim individually and on behalf of the Class.

132.    At the time Plaintiff and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as safe and sustainable.

133.    Defendant affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for use.

134.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

135.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

136.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

137.    Plaintiff and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Product.

138.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VI
### (Constructive Fraud)

139.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

140.    Plaintiff brings this claim individually and on behalf of the Class.

141.    At the time Plaintiff and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

142.    Defendant affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for consumption and otherwise sustainable.

143.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

144.    Defendant had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiff and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

145.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

146.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

147.    Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Product, and what information was available regarding the Product.

148.    Defendant breached its duty to Plaintiff and Class Members to make full disclosures of the safety of their Product.

149.     Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

<u>**COUNT VII**</u>
**(Fraudulent Inducement)**

150.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

151.     Plaintiff brings this claim individually and on behalf of the Class.

152.     Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

153.     Defendant knew, or should have known, that the Product was falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

154.     Defendant also knew that its omissions and misrepresentations regarding the Product was material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

155.     Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

156.     Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

157.     Plaintiff and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Product, and what information was available regarding the Product.

158.    Defendant intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the Product based upon its affirmative representations and omissions.

159.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VIII
### (Money Had and Received)

160.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

161.    Plaintiff brings this claim individually and on behalf of the Class.

162.    As a result of the Plaintiff's and Class Members' purchase of the Product, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and Class Members in an amount to be determined at trial.

163.    No part of any of the monies due and owing to Plaintiff and Class Members has been repaid, although Plaintiff and Class Members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT IX
### (Fraudulent Concealment or Omission)

164.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

165.    Plaintiff brings this claim individually and on behalf of the Class.

166.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Product.

167.    Defendant, acting through its representatives or agents, delivered the Product to its own distributors and various other distribution channels.

168.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Product as discussed throughout.

169.    Rather than inform consumers of the truth regarding the Product, Defendant misrepresented the quality of the Product as discussed herein at the time of purchase.

170.    Defendant made these material misrepresentations to boost or maintain sales of the Product, and to falsely assure purchasers of the Product that Defendant is a reputable company and that its Product is safe for use and is otherwise sustainable.  The false representations were material to consumers because the representations played a significant role in the value of the Product purchased.

171.    Plaintiff and Class Members accepted the terms of use, which were silent on the true nature of the Product, as discussed throughout.  Plaintiff and Class Members had no way of knowing that Defendant's misrepresentations as to the Product, and had no way of knowing that Defendant's misrepresentations were misleading.

172.    Although Defendant had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

173.    Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Product were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Product.  Such benefits came at the expense of Plaintiff and Class Members.

174.    Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and class members' actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control of material facts, and such facts were not known to the public.

175.    Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Product that did not live up to its advertised representations. Plaintiff and Class Members are entitled to recover full refunds for the Product they purchased due to Defendant's misrepresentations.

176.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### COUNT X
### (Fraudulent Misrepresentation)

177.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

178.    Plaintiff brings this claim individually and on behalf of the Class.

179.    Defendant falsely represented to Plaintiff and the Class that the Product was safe for use and otherwise sustainable.

180.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Product.

181.    Defendant knew or should have known that its representations about the Product were false in that the Product is not safe for consumption as discussed throughout.  Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

182.    Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment.  Given the deceptive manner in which Defendant advertised,

marketed, represented, and otherwise promoted the Product, Plaintiff's and the Class' reliance on Defendant's misrepresentations was justifiable.

183. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known of the safety risks associated with the Product and that it does not conform to the Product's labels, packaging, advertising, and statements.

184. Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT XI
### (Negligent Misrepresentation)

185. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

186. Plaintiff brings this claim individually and on behalf of the Class.

187. Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Product.

188. Defendant breached its duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Product from the marketplace or take other appropriate remedial action.

189. Defendant knew or should have known that the qualities and characteristics of the Product were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant. Specifically, Defendant knew or should have known that the Product was not safe for use and not sustainable.

190. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known that the Product was not safe for consumption and that the Product does not conform to the Product's labeling, packaging, advertising, and statements.

191. Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT XII
### (Quasi-Contract / Unjust Enrichment)

192. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

193. Plaintiff brings this claim individually and on behalf of the Class.

194. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

195. Plaintiff and Class Members conferred benefits on Defendant by purchasing the Product.

196. Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Product. Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product was unfit for its intended purpose as it was unsafe for use. These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Product if the true facts were known.

197. Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT XIII
### (Breach of Express Warranty)

198.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

199.    Plaintiff brings this claim individually and on behalf of the Class.

200.    Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased the Product.

201.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

202.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

203.    As set forth above, Defendant purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is otherwise sustainable.

204.    Plaintiff and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

205.    Defendant breached express warranties about the Product and its qualities because despite Defendant's warranties that the Product is safe for consumption and is otherwise sustainable the Product is objectively not in fact safe for use and not sustainable.  Thus, the Product did not confirm to Defendant's affirmations and promises described above.

206.    Plaintiff and each Class Member would not have purchased the Product had they known the true nature of the Product.

207. As a result of Defendant's breach of warranty, Plaintiff and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

## COUNT XIV
### (Negligent Failure to Warn)

208. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

209. Plaintiff brings this claim individually and on behalf of the Class.

210. At all relevant times, Defendant were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product and its packaging. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

211. At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

212. Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of the Product.

213. At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

214. Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Product, including Plaintiff and the Class, regarding the true nature of the Product, its risks, and potential dangers.

215. Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Product contains ingredients known to cause adverse health effects in humans.

216. Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Product as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks. Defendant failed to exercise reasonable care in providing Plaintiff and the Class with adequate warnings.

217. As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Product, including its intended use, could cause and has caused injuries and other damages, Plaintiff and the Class have suffered damages, as described herein. Plaintiff also requests medical monitoring as a means to safeguard their health and mitigate any damages for future medical treatment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and the California Subclass and Plaintiff's attorneys as Class Counsel;

(b) For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff, the Class, and the California Subclass on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper;

(h)   For medical monitoring as a means to safeguard Plaintiff's and Class Members health and to mitigate any damages for future medical treatment; and

(i)   For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

### DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 31, 2022

Respectfully submitted,

By:   _/s/ Carl V. Malmstrom_
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLC**
Carl V. Malmstrom
111 W. Jackson St., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Fax: (212) 686-0114
Email:  malmstrom@whafh.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*Pro Hac Vice* Forthcoming)
Sean L. Litteral (*Pro Hac Vice* Forthcoming)
Julia K. Venditti (*Pro Hac Vice* Forthcoming)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com
        slitteral@bursor.com
        jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice* Forthcoming)
Alec M. Leslie (*Pro Hac Vice* Forthcoming)

888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com
       aleslie@bursor.com

*Attorneys for Plaintiffs and the Putative Class*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Carl V. Malmstrom, declare as follows:

1.    I am an attorney at law licensed to practice in the State of Illinois and a member of the bar of this Court. I am Of Counsel at Wolf Haldenstein Adler Freeman & Herz LLC, counsel of record for Plaintiff Ken McDowell. Plaintiff McDowell resides in San Rafael, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.    The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of Illinois. Additionally, Defendant maintains its principal place of business in this District and Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiffs from this District.

I declare under the penalty of perjury under the laws of the State of Illinois and the United States that the foregoing is true and correct and that this declaration was executed at Chicago, Illinois, this 31st day of March, 2022.

                         */s/ Carl V. Malmstrom*
                          Carl V. Malmstrom

# EXHIBIT L

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

JOSEPH COLLORA, individually and on
behalf of all others similarly situated,

                         Plaintiff,

       v.

MCDONALD'S CORPORATION,

                         Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Joseph Collora ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant McDonald's Corporation ("Defendant" or "McDonald's"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiff brings this Class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, certain of Defendant's Products – namely, Defendant's Chicken McNuggets, Cookies, and/or French Fries (the "Products"), which are unfit for human consumption because the packaging in which it is contained—and is essential and integral to delivering the Product to the consuming public[1]—

---

[1] "Products" as used herein means the food items (e.g. Chicken McNuggets, Cookies, and/or French Fries) as well as any and all containers, wrappers, and packaging used to package, seal, protect, or deliver the food items to the consumer. These particular Products have been independently tested and found to contain PFAS.

contains unsafe per- and polyfluoroalkyl substances ("PFAS").[2]

2.     PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[3]

3.     In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[4]

4.     Despite Defendant's outward representations to consumers that its Products are "safe,"[5] and "sustainable,"[6] including on its website and the Products' packaging—which is an essential and integral part of delivering the Products to consumers—independent research

---

[2] Discovery may reveal that additional McDonald's products are within the scope of this Complaint. Accordingly, Plaintiff reserves the right to include additional food products identified throughout the course of discovery

[3] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.

[4] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last visited Mar. 30, 2022).

[5] *See, e.g.*, McDonald's, "Our Food Philosophy," https://www.mcdonalds.com/us/en-us/about-our-food/our-food- philosophy.html (last visited Mar. 30, 2022) ("At McDonald's . . . [w]e take great care that what we serve every day is safe, great quality, offers choice and is produced in a responsible way.").

[6] *See, e.g.*, McDonald's, "Packaging & Waste," https://corporate.mcdonalds.com/corpmcd/our-purpose-and- impact/our-planet/packaging-and-waste.html (last visited Mar. 30, 2022) ("Meeting Customer Expectations of Convenience, Safety and Sustainability . . . Together with our Franchisees, suppliers and industry partners, we invest in research and development of new materials and packaging designs that fit our customers' needs for convenience, food safety and sustainability.").

conducted by Consumer Reports[7] determined that the Products' packaging contains total organic fluorine, a measure of PFAS used by Consumer Reports at levels of high concern:

- For the French Fries, 250.3 parts per million (ppm) of organic fluorine;

- For the Cookies: 250.0 ppm of organic fluorine; and

- For the Chicken McNuggets: 219.0 ppm of organic fluorine. [8]

5.      As a point of reference, in 2023 California will ban food packaging that has over 100 parts per million organic fluorine or more; Denmark already bans food packaging with just over 20 part per million organic fluorine, representing both jurisdiction's level of concern for PFAS[9].

6.      The potential for contamination of a consumer's food item with PFAS from packaging is omitted from Defendant's packaging and marketing of the Products.

7.      Thus, based on Defendant's omissions, a reasonable consumer would expect that the Products can be safely purchased and consumed as marketed and sold. However, the Products are not safe, posing a significant health risk to unsuspecting consumers. Nor are the Products sustainable. Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiff that the Products are unsafe and harmful to the environment, contains heightened levels of PFAS, or should otherwise be approached with caution.

8.      Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all other similarly situated for (1) Fraud; (2) Unjust Enrichment; (3) the New

---

[7] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited Apr. 12, 2022).
[8] According to Toxin Free USA, "organic fluorine results identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources." *See GMO Free v. CoverGirl Cosmetics, et al.*, Case No. 2021-CV-0046786B (D.C. Super. Dec. 20, 2021), Docket No. 1, ¶¶ 30-31.
[9] "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*. (Link *supra*.)

York General Business Law § 349; and (4) the New York General Business Law § 350.

## THE PARTIES

9.      Plaintiff Joseph Collora is a natural person and citizen of New York who resides in Lindenhurst, New York.  Plaintiff Collora has purchased Defendant's Products, including the French Fries, Cookies, and Chicken McNuggets, at various points throughout the past  several years during all applicable statutory periods, visiting the McDonald's restaurant at 221 Sunrise Hwy, Lindenhurst, NY 11757 about twice monthly. Mr. Collora purchased Chicken McNuggets from this McDonald's as recently as March 29, 2022; French Fries as recently as January 10, 2022; and Cookies as recently as January 10, 2022.

10.     Prior to his purchase, Mr. Collora reviewed the labeling, packaging, and marketing materials of his purchased Products, including those set out herein, which included omissions of the potential for PFAS contamination. Mr. Collora understood that based on Defendant's claims, that Products were safe for consumption, and otherwise a sustainable product. Mr. Collora reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Mr. Collora suffered and continues to suffer, economic injuries.

11.     Mr. Collora continues to desire to purchase the Products from Defendant, as he has done on a twice monthly basis. However, Mr. Collora is unable to determine if the Products are actually safe and sustainable. Mr. Collora understands that the composition of the Products may change over time. But as long as Defendant continues to market its Products as

"safe" and "sustainable" and further omit the potential for PFAS contamination, he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and its competitor's Products. Mr. Collora is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

12.     Defendant McDonald's Corporation is a Delaware corporation with its principal place of business located in Chicago, Illinois.

## **JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

14.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District, and the acts and transactions giving rise to this action occurred in this District.

15.     This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District and because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A.     Food And Consumer Preferences

16.     According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[10]  Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[11]

17.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[12]

18.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[13]

19.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[14]

---

[10] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among- consumers/ (last visited Mar. 30, 2021).

[11] *Id.*

[12] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-conent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).

[13] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage- processors/ (last visited Mar. 22, 2022).

[14] Made Safe, "What Shoppers Want," at 3.

20.    Thus, there is enormous incentive for companies such as Defendant to market its Products as safe and sustainable. In fact, the vast majority of Defendant's mission statement regarding food safety, in its own words, can be summed up as follows:

> "Providing safe food is our number one priority and a responsibility that we take seriously."[15]

21.    Defendant has amplified this ethos in its packaging, which, as Defendant notes, "lives seamlessly with the brand identity, as they were created in parallel over the course of four years. The point-of-view and principles hold true across every menu item to make way for a cohesive system[.]"[16]

22.    Thus, when consumers, like Plaintiff interact with Defendant's packaging, they expect it to embody Defendant's brand, which as noted above, has continuously emphasized safety and sustainability.

23.    As Defendant notes: "The safety and quality of our food is a top priority, and we are constantly innovating the strive to meet and exceed our customers' expectations."[17]

24.    However, as described in the next section, Defendant's Products are not safe for consumption, and poses a critical risk to the safety and health of consumers.

**B.    PFAS In Food Packaging Is Harmful To Humans And The Environment**

25.    Consumer Reports' study followed the 2018 groundbreaking research conducted by Toxic Free Future, which first detected PFAS in the Product packaging.[18]

---

[15] McDonald's, "Food Safety, https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/food-quality-and- sourcing/food-safety.html (last visited Mar. 30, 2022).
[16] Packaging Europe, "The inside story of the McDonald's packaging rebrand," (Mar. 11, 2021), https://packagingeurope.com/the-inside-story-of-the-mcdonalds-packaging-rebrand/347.article          (last visited Mar. 30, 2022).
[17] *Id.* at 10.
[18] Jen Dickman, *et al.* "Packaged in Pollution: Are food chains using PFAS in packaging?" https://toxicfreefuture.org/packaged-in-pollution/ (last visited Mar. 30, 2022).

26.     Nonetheless, more than three years later, Consumer Reports revealed that PFAS had not been removed from the Products' packaging. That results of that research is set out below:

| McDonald's | | |
|---|---|---|
| Bag for french fries | 🟥🟥 | 250.3 |
| Bag for cookies | 🟥🟥 | 250.0 |
| Bag for Chicken McNuggets | 🟥🟥 | 219.0 |
| Container for Big Mac | 🟥🟥 | 195.3 |
| Wrapper for double cheeseburger | | 15.0 |
| Container for Chicken McNuggets | | 13.5 |
| Container for french fries | | 7.5 |
| Wrapper for Egg McMuffin | | 7.0 |
| Wrapper for McChicken sandwich | | ND |

27.     The reason companies like Defendant use PFAS in their food packaging products is simple: the coating acts "as a barrier to keep grease from escaping" and "from leaking into people's hands."[19]

28.     But PFAS are not necessary for this intended outcome. Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no

---

[19] Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last visited Mar. 30, 2022).

detectable levels of organic fluorine.[20] Accordingly, Defendant would have had knowledge that it could produce the Products' packaging without the heightened levels of PFAS inherent in its current composition.

29. Yet, Defendant chose not to, and instead concealed this information from consumers, to increase the cost savings associated with using these chemicals.

30. This has not been without consequences for consumers, as PFAS in food packaging migrates[21] onto the food, exposing consumers to PFAS via ingestion.[22]

31. Worse yet, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which make them highly persistent both in the environment and in human bodies.

32. That these substances are harmful to the human body is beyond dispute. In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on the human organ systems, with the greatest impact seen in the liver and thyroid hormone.[23]

33. The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[24]

34. In total, this research demonstrates that the risk of severe complications arising from exposure to PFAS is both credible and substantial.

---

[20] *See supra* n. 27 and *supra* n. 6

[21] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784

[22] *See* Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, https://ntp.niehs.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last visited Mar. 30, 2022).

[23] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last visited Mar. 30, 2022).

[24] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS," https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Mar. 30, 2022).

## C.    Defendant's Misrepresentation and Omissions Are Actionable

35.    Plaintiff and the Class were injured by the full purchase price of the Product because the Products are worthless, as Defendant has omitted the PFAS contamination risk due to the Products' packaging.

36.    Plaintiff and Class Members bargained for products that are marketed and warranted as safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them a product in packaging containing dangerous substances with well-known health and environmental consequences.

37.    No reasonable consumer would expect that a product marketed and warranted as safe and sustainable would pose a risk to their health, safety, and well-being, or that it would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans and the environment.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

38.    As the Products expose consumers to PFAS that pose a risk to consumers' health, the Products are not fit for consumption by humans.  Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to high levels of toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

39.    Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects.  Nonetheless, Defendant concealed and affirmatively misrepresented the Products, as discussed herein.

40.    Although Defendant is in the best position to know what content it placed on its

website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the PFAS and its failure to disclose the existence of PFAS in the Products to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

41. **WHO**: Defendant made material misrepresentations and/or omissions of fact about the Products through its labeling, website representations, and marketing statements, which include the statements and warranties that the Products are safe and sustainable. These representations constitute omitted material information regarding harmful chemicals in the Products' packaging which is essential and integral to delivering the Products to the consumer.

42. **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain substances—PFAS—that are widely known to have significant health repercussions. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe and sustainable, when they is not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Products in this manner.

43. **WHEN**: Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products' packaging contained harmful substances.

44. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Products' packaging, website, and through marketing materials.

45. **HOW**: Defendant made material misrepresentations and/or failed to disclose

material facts regarding the Products, including the presence of PFAS.

46.    **WHY**: Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to millions of consumers.

47.    **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

48.    Defendant would have had actual knowledge for years that the Products' packaging contains harmful chemicals such as PFAS.

49.    Although Defendant was aware of the deception in its labeling given the inclusion of PFAS in the Products despite claims of the Products' safety and sustainability, Defendant took no steps to warn Plaintiff or Class Members of risks related to PFAS in the Products.

50.    Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products. Defendant had a duty to disclose the true nature and quality of the Products and to disclose the health and safety risks associated with the Products.

51.    Defendant made, and continues to make, affirmative misrepresentations to consumers, to promote sales of the Products, including that the Products are safe and sustainable.

52.    Defendant concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products. Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members. Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's

concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

53.     The PFAS included in the formulation, design and/or manufacture of the Products packaging were not reasonably detectible to Plaintiff and Class Members.

54.     At all times, Defendant actively and intentionally concealed the existence of the PFAS and failed to inform Plaintiff or Class Members of the existence of the PFAS.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

55.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Products' packaging contained harmful chemicals.

56.     Defendant concealed or misrepresented the PFAS for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

57.     As a result of Defendant's active concealment of the PFAS and/or failure to inform Plaintiff and Class Members of the PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Products.

58.     Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Products contained PFAS, which, at the very earliest, would have been in March 2022.  Plaintiff and Class Members had no realistic ability to discern that the Products contained PFAS until after the widely publicized Consumer Reports study.  Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of PFAS in the Products and of the Products'

true nature.

## CLASS ALLEGATIONS

59.    Plaintiff brings this action on behalf of himself and the following Classes pursuant

to Fed. R. Civ. P. 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **National Class:** All persons within the United States who, during the maximum
> period of time permitted by law, purchased Defendant's Products primarily for
> personal, family, or household purposes, and not for resale.

> **New York Subclass:** All persons residing in New York who, during the
> maximum period of time permitted by law, purchased the Products primarily for
> personal, family or household purposes, and not for resale.

60.    Excluded from the Classes are (a) any person who purchased the Products for

resale and not for personal or household use, (b) any person who signed a release of any

Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate

family members of the officers, directors or employees, of any Defendant or any entity in which

a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any

Defendant, (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their

immediate family members, and (f) Class Counsel.

61.    As a result of additional information obtained through further investigation and

discovery, the above-described Classes may be modified or narrowed as appropriate.

62.    At this time, Plaintiff does not know the exact number of members of the

aforementioned Class and Subclasses (referred to herein collectively as "Class Members" or

"Subclass Members"). However, given the nature of the claims and the number Defendant's

restaurants in the United States selling Defendant's Products, Plaintiff believes that Class and

Subclass Members are so numerous that joinder of all members is impracticable.

63.    There is a well-defined community of interest in the questions of law and facts

involved in this case. Questions of law and facts common to Class Members predominate over questions that may affect individual Class Members include:

      (a)     whether the Products contain PFAS;

      (b)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

      (c)     whether Defendant's conduct was unfair and/or deceptive;

      (d)     whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

      (e)     whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

64.    With respect to the New York Subclass, additional questions of law and fact common to the members include whether Defendant violated New York General Business Law §§ 349 & 350.

65.    Plaintiff's claims are typical of those of the Class because Plaintiff, like all Class Members, purchased, in a typical consumer setting, Defendant's Products at issue in this Complaint—Chicken McNuggets, Cookies, and French Fries—and Plaintiff sustained damages from Defendant's wrongful conduct.

66.    Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

67.    The class mechanism is superior to other available means for the fair and efficient

adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

### COUNT I
**COMMON LAW FRAUD**
**(On Behalf of the National Class,**
**or in the alternative the New York Subclass)**

68.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

69.     Plaintiff brings this claim individually and on behalf of the National Class, or in the alternative, the New York Subclass.

70.     Rule 9(b) of the Federal Rules of Civil Procedures provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

- **WHO**: Defendant made material misrepresentations and/or omissions of fact about the Products through its labeling, website representations, and marketing statements, which include the statements and warranties that

16

the Products are safe and sustainable. These representations constitute omitted material information regarding harmful chemicals in the Products' packaging which is essential and integral to delivering the Products to the consumer.

- **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain substances— PFAS—that are widely known to have significant health repercussions. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe and sustainable, when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products in this manner.

- **WHEN**: Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products' packaging contained harmful substances.

- **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Products' packaging, website, and through marketing materials.

- **HOW**: Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of

PFAS.

- **WHY**: Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to millions of consumers.

71.     As alleged herein, at the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented the Products as safe and sustainable.

72.     Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions; nevertheless, Defendant did make such omissions in their marketing, advertising, and on the Products' labeling. In reliance on these representations and omissions, Plaintiff and Class Members were induced to, and did, pay monies to purchase the Products.

73.     Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

74.     Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

75.     Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT II
### UNJUST ENRICHMENT
#### (On Behalf of the National Class
#### or in the alternative the New York Subclass)

76.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

77.     Plaintiff brings this claim individually and on behalf of the National Class, or in the alternative the New York Subclass.

78.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

79.     Plaintiff and Class Members conferred benefits on Defendant by purchasing the Products.

80.     Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were unfit for their intended purpose as they were unsafe for use. These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts were known.

81.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT III
### VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT,
### NEW YORK GEN. BUS. LAW § 349, *ET SEQ.*
#### (On behalf of the New York Subclass)

82.     Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

83.     By reason of the acts set forth above, Defendant has been and is engaged in

deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

84. Defendant engaged in unfair and/or deceptive conduct by, *inter alia*, omitting the presence of PFAS in the Products' packaging.

85. The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false, deceptive, or misleading statements implicate the health and safety of those consumers deceived by Defendant.

86. Defendant directs its conduct at consumers, as Defendant's omissions are contained in marketing targeted toward consumers, including social media and retail product packaging. As such, Defendant's conduct as alleged herein is consumer oriented.

87. Defendant's deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

88. Defendant's deceptive acts affect the public interest in the state of New York because, upon information and belief, consumers located in New York have purchased Defendant's Products in reliance on Defendant's false, deceptive, or misleading statements.

89. As a result of Defendant's use of employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the New York Subclass have sustained damages in an amount to be proven at trial.

**COUNT IV**
**VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICE ACT,**
**NEW YORK GEN. BUS. LAW § 350, *ET SEQ.***
**(On behalf of the New York Subclass)**

90. Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

91. Defendant has made material, false or misleading statements or representations of

fact about the Products. Specifically, Defendant has literally, impliedly, or by necessary implication omitted the presence of PFAS in the packaging, thereby representing that the Products *do not* contain PFAS, which is not true.

92.    Defendant's acts constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Business Law § 350.

93.    The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false or misleading statements implicate the health and safety of those consumers deceived by Defendant.

94.    As such, Defendant's conduct as alleged herein is consumer oriented.

95.    As a result of Defendant's material, false or misleading statements or representations of fact about the Products, Plaintiff and each of the other Members of the New York Subclass have sustained damages in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and the New York Subclass and Plaintiff's attorneys as Class Counsel;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class, and the New York Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper;

(h)     For an order awarding Plaintiff and the Class and Illinois Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: April 13, 2022               Respectfully submitted,

By:   */s/ Kevin Laukaitis*
Kevin Laukaitis**
Jonathan Shub**
**SHUB LAW FIRM LLC**
134 Kings Hwy E., 2nd Fl.
Haddonfield, NJ 08033
T: (856) 772-7200
F: (856) 210-9088
klaukaitis@shublawyers.com
jshub@shublawyers.com

Brian M. Hogan*
**FREED KANNER LONDON &
MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
bhogan@fkmlaw.com

Jonathan M. Jagher
**FREED KANNER LONDON &
MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fkmlaw.com

*Designated as Local Counsel
** Admitted to Illinois General Bar

*Attorneys for Plaintiff and the
Proposed Classes*

# EXHIBIT M

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3
### Eastern Division

Ken McDowell

                        Plaintiff,

v.                                  Case No.: 1:22−cv−01688
                                  Honorable Franklin U. Valderrama

McDonald's Corporation

                        Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, May 13, 2022:

      MINUTE entry before the Honorable Franklin U. Valderrama: Plaintiff Ken McDowellto's unopposed motion to relate cases pursuant to Local Rule 40.4 [9] is granted. Mailed notice (axc).

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.



# United States District Court
# Northern District of Illinois

In the Matter of

Joseph Collora

v.

McDonald's Corporation

District Judge Franklin U. Valderrama

Case No. 22-CV-1904

Designated Magistrate Judge
Jeffrey Cummings

### FINDING OF RELATEDNESS PURSUANT TO
### LOCAL RULE 40.4

In accordance with the provisions of Local Rule 40.4 of this Court, I find the above captioned case, presently pending on the calendar of Judge Sara L. Ellis  to be related to  1:22-cv-01688 which is pending on my calendar.  Accordingly, I request that the Executive Committee order said case to be reassigned to my calendar as a related case.

_____
**Judge Franklin U. Valderrama**

Date: Friday, May 13, 2022

### ORDER OF THE EXECUTIVE COMMITTEE

IT IS HEREBY ORDERED that the above captioned case be reassigned to the calendar of Judge Franklin U. Valderrama

### ENTER

### FOR THE EXECUTIVE COMMITTEE

_____
**Chief Judge Rebecca R. Pallmeyer**

Dated:Monday, May 16, 2022

District Reassignment  - Finding of Relatedness

# EXHIBIT N

This is not the current EPA website. To navigate to the current EPA website, please go to www.epa.gov. This website is historical material reflecting the EPA website as it existed on January 19, 2017. This website is no longer updated and links to external websites and some internal pages may not work.  More information »

**Menu**

United States Environmental Protection Agency

Search 1/19/17 snapshot

**Related Topics:   PFOA, PFOS and Other PFASs**

 Share

Contact Us

---

# Basic Information about Per- and Polyfluoroalkyl Substances (PFASs)

## *Includes Information on Perfluorooctanoic Acid (PFOA), Perfluorooctyl Sulfonate (PFOS), and All Other PFASs, and on PFCs*

Basic Information

How People are Exposed

Health Effects

Related Information from Other Sources

**One Group of Chemicals,
Many Names**

Different types of scientists may refer to the same class of chemicals by different names. This is often the case for PFASs. You may see some commonly used terms for PFASs and subgroups of chemicals within PFASs, including:

- Per- and polyfluoroalkyl substances (PFASs)
- Perfluorinated chemicals
- Perfluorochemicals
- Perfluoroalkyls
- Perfluorinated alkyl acids
- Long-chain perfluorinated chemicals (LCPFCs)
- Polyfluorinated chemicals
- Polyfluorinated compounds

Two key PFAS chemicals are **PFOS**, or perfluorooctyl sulfonate, and **PFOA**, or perfluorooctanoic acid.  In the past, PFOA has sometimes been referred to as C8 (because it has eight carbon atoms).

Related information: What are PFCs and How Do They Relate to PFASs?

# Basic Information

On this tab:

- What are perfluorooctanoic acid (PFOA), perfluorooctane sulfonate (PFOS) and other perfluoroalkyl substances (PFASs)?
- What are PFASs used for?
- Where are PFASs made?
- How widespread are these chemicals in the environment?

On a related page:

- What are PFCs and how do they relate to PFASs?

## What are perfluorooctanoic acid (PFOA), perfluorooctane sulfonate (PFOS) and other perfluoroalkyl substances (PFASs)?

Per- and polyfluoroalkyl substances (together, PFASs) are a class of man-made chemicals. They are not found naturally in the environment.  PFOA and PFOS have been the most extensively produced and studied of these chemicals.  Both chemicals are very persistent in the environment and in the human body.

Molecules in all PFASs chemicals contain carbon and fluorine atoms; some PFASs also include oxygen, hydrogen, sulfur and/or nitrogen atoms. One characteristic that differentiates molecules of one PFASs from those of another is the *chain length*, or the number of carbon atoms, in the molecule. For example, PFOA has eight carbon atoms, which is why it is sometimes referred to as C8.

Scientists sometimes study PFASs as a group because of potential similarities in their chemical properties and their toxicity. Some studies compare one PFAS chemical to another to understand the relationship between the chemical's chain length and its toxicity. Scientists are also investigating:

- how the toxicity of one PFAS is similar or different to that of other PFASs, and
- toxicologically, what all PFASs have in common.

Related: What are PFCs and How Do They Relate to PFASs?

Top of Page

## What are PFASs used for?

PFASs have been widely used to make products more stain-resistant, waterproof and/or nonstick. For example, PFASs have been used in the manufacture of products that:

- keep food from sticking to cookware,
- make upholstered furniture, carpets and clothing resistant to soil, stains and water,
- make shoes, clothes and mattresses more waterproof,
- keep food packaging from sticking to food, and
- help fight fires at airfields and other places where petroleum-product-based fires are a risk.

Because they help reduce friction, they are also used by a variety of other industries such as aerospace, automotive, construction, and electronics factories or businesses.

Top of Page

## Where are PFASs made?

- Certain PFAS chemicals, including PFOA and PFOS, are no longer manufactured in the United States as a result of voluntary phaseouts and the PFOA Stewardship Program, with a few exceptions for limited industrial uses. As part of the Stewardship Program, eight major chemical manufacturers committed to eliminate by 2015:
  - the use of PFOA and PFOA-related chemicals in their products, and
  - PFOA and PFOA-related chemical emissions from their facilities.
  All companies have indicated that they have met the PFOA Stewardship Program goals. Learn more about the PFOA stewardship program.
- Although PFOA and PFOS are no longer manufactured in the U.S., they are still produced in other locations around the globe, and they may continue to be imported into the United States in consumer goods such as carpets, leather and apparel, textiles, paper and packaging, coatings, and rubber and plastics.

Top of Page

## How widespread are these chemicals in the environment?

6/1/22, 11:...  Basic Information about Per- and Polyfluoroalkyl Substances (PFAS) | Per- and Polyfluoroalkyl Substances (PFAS) | ... our Envi...

Case 3:22-cv-00628-NJR Document 28 Filed 06/01/22 Page 163 of 190 Page ID #369

PFOA, PFOS and other PFASs are widespread around the globe, primarily due to their manufacturing, processing and use here in the U.S. and internationally. They are widespread in part because they are *persistent* in the environment – that is, they do not break down when exposed to air, water or sunlight. As a result, people may become exposed to PFASs manufactured months or years in the past.

Due to their persistence, PFASs can travel long distances through the air; monitoring in the Arctic has shown levels of PFASs in air, water, and living things.  As a result, people may become exposed to low levels of PFASs manufactured or emitted from production facilities thousands of miles away.

Because these chemicals have been used in an array of consumer products, most people have been exposed to them.  Studies have found PFOS and PFOA in blood samples of humans and wildlife nationwide. Using data from CDC's 2003–2004 National Health and Nutrition Examination Survey (NHANES), scientists detected PFASs in over 98% of the thousands of blood samples collected during the survey.   In more recent years, blood sampling data indicate that exposures are declining in the U.S. population, most likely due to the decline in U.S. manufacturing resulting from the PFOA Stewardship Program.

Top of Page

Contact Us to ask a question, provide feedback, or report a problem.

# Discover.

**Accessibility**

**EPA Administrator**

**Budget & Performance**

**Contracting**

**Grants**

**No FEAR Act Data**

**Privacy and Security**

# Connect.

**Data.gov**

Inspector General

Jobs

Newsroom

Open Government

Regulations.gov

Subscribe

USA.gov

White House

# Ask.

Contact Us

Hotlines

FOIA Requests

Frequent Questions

# Follow.

LAST UPDATED ON JULY 26, 2016

<

# EXHIBIT O

✉ Get 3M Settlement email updates

You can manage your subscription preferences and make changes as needed.

> jane.doe@example.com

[ Next ]

On Feb. 20, 2018, the state of Minnesota settled its lawsuit against the 3M Company in return for a settlement of $850 million. Minnesota's attorney general sued 3M in 2010 alleging that the company's production of chemicals known as PFAS had damaged drinking water and natural resources in the Twin Cities Metropolitan Area. After legal and other expenses are paid, about $720 million will be invested in drinking water and natural resource projects in the Twin Cities east metropolitan region.

The Minnesota Pollution Control Agency (MPCA) and Minnesota Department of Natural Resources (DNR) are co-trustees of these funds.

## Final Drinking Water Supply Plan

The Minnesota Pollution Control Agency and the Department of Natural Resources, Co-Trustees of the Settlement, have released plans to spend $700 million on drinking water projects for 14 impacted communities in the East Metropolitan Area.

Working in partnership with work group members, along with input from citizens, stakeholders, and technical experts from each of the affected communities, the comprehensive set of projects account for every home, neighborhood, and community in the 150 square miles affected by PFAS contamination in the East Metropolitan Area to ensure all recommendations provide safe and sustainable drinking water now and into the future.

**Press release: State announces comprehensive drinking water plan for 14 East Metro communities impacted by PFAS (https://www.pca.state.mn.us/news/state-announces-comprehensive-drinking-water-plan-14-east-metro-communities-impacted-pfas)**

See the **Final Drinking Water Supply Plan (/investing-east-metro-drinking-water)** webpage for an overview of the plan and community projects.

See the **full plan (/full-plan-documents-conceptual-drinking-water-supply-plan)** for more detailed information.

**Recording of the 3M public meeting (Sept. 2021) (https://www.youtube.com/watch?v=s5PJ4_3mbA0)**

**Sign up to receive email updates (http://public.govdelivery.com/accounts/MNPCA/subscriber/new?topic_id=MNPCA_334)** on this work, along with more information on how to participate in meetings and provide input.

## Well sampling in the east metro area

If you live in the area that is a priority for testing, you can request that your private well water be tested.

- To see if you live in the priority sampling area, use the **interactive map (https://mpca.maps.arcgis.com/apps/View/index.html?appid=4ab8c82e20c24182b56f6b608d42a602&amp;extent=-93.1182,44.8076,-92.7378,44.9861)**.

- If you live in the priority sampling area, you can request to have your well tested by **filling out and submitting this online form (https://webapp.pca.state.mn.us/gw-sampling-req/)**.

More information about the priority testing area is available on the Well sampling in the East Metro Area webpage (https://www.pca.state.mn.us/waste/well-sampling-east-metro-area).

# Our groundwater connection



Our Groundwater Connection

Video courtesy of Washington County

| Related links and documents |
| --- |
| Minnesota's PFAS Blueprint (https://www.pca.state.mn.us/waste/minnesotas-pfas-blueprint) |
| MPCA PFAS webpage (https://www.pca.state.mn.us/waste/pfas-investigation-and-clean-up) |
| DNR website (https://www.dnr.state.mn.us/) |
| Minn. Department of Health PFAS information (https://www.health.state.mn.us/communities/environment/hazardous/topics/pfcs.html) |
|  3M Settlement biannual report, February 2022 (https://3msettlement.state.mn.us/sites/default/files/3M%20Settlement%20biannual%20report%2C%20February%202022.pdf) |

6/1/22, 11:33 AM                                  Minnesota 3M PFAS Settlement | Who Gets the Minnesota 3M PFAS Settlement?

Case 3:22-cv-00628-NJR   Document 28   Filed 06/01/22   Page 168 of 190   PageID #374

Minnesota Pollution Control Agency (https://www.pca.state.mn.us)

651-296-6300 (tel:+16512966300)

800-657-3864 (tel:+18006573864)

Department of Natural Resources (https://www.dnr.state.mn.us)

651-296-6157 (tel:+16512966157)

888-646-6367 (tel:+18886466367)

Email us with a question

• Conceptual Plan and drinking water (mailto:pfasinfo.pca@state.mn.us)

• Natural resource enhancement and recreational opportunity grant (mailto:3mpriority2@state.mn.us)

# EXHIBIT P



World   Business   Markets   Breakingviews   Video   More 

ENVIRONMENT

FEBRUARY 13, 2017 / 3:49 AM / UPDATED 5 YEARS AGO

# DuPont settles lawsuits over leak of chemical used to make Teflon

By Arathy S Nair



(Reuters) - DuPont and Chemours Co have agreed to pay $671 million in cash to settle thousands of lawsuits involving a leak of a toxic chemical used to make Teflon, the companies said on Monday.

FILE PHOTO -- The Dupont logo is displayed on a board above the floor of the New York Stock Exchange shortly after the opening bell in New York, U.S. on December 22, 2015. REUTERS/Lucas Jackson/File Photo

Shares of Chemours jumped 13 percent. The company said it would pay half of the settlement, although liability for litigation connected with the chemical was passed onto it when DuPont spun it off in 2015.

In addition, Jefferies analyst Alexander Laurence said the liability was $300 million below Wall Street estimates, and DuPont shares rose 1 percent.

The companies settled about 3,550 personal injury claims arising from the leak of perfluorooctanoic acid, which is also known as PFOA or C-8, from its plant in Parkersburg, West Virginia.

The leak allegedly contaminated local water supplies and has been linked to six diseases, including testicular and kidney cancers.

"We look forward to working with DuPont to finalize this settlement and get these injured class members paid as quickly as possible," plaintiffs' lawyer Rob Bilott said in a statement.

Both companies denied any wrongdoing.

DuPont said in a statement that it had stopped using C-8 in operations at the West Virginia plant more than a decade ago. It had used the chemical there since the early 1950s.

Chemours General Counsel David Shelton called the settlement a "sound resolution."

The settlement comes as DuPont and Dow Chemical Co expect to close their $130 billion merger later this year.

In 2001, residents brought a class action against DuPont over C-8 exposure. The company agreed in 2004 to fund medical monitoring programs and install new water treatment systems.

6/1/22, 11:13AM
Case 3:22-cv-00628-NJR    Document 28    Filed 06/01/22    Page 172 of 190    Page ID #378
DuPont settles lawsuit over flow of chemical used to make Teflon | Reuters

DuPont convened a panel of scientists to determine whether any diseases were linked to C-8. The panel concluded that there was a probable link with six illnesses: kidney and testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension and high cholesterol.

Members of the class action lawsuit also sued DuPont individually, and the litigation was consolidated in federal court in Columbus, Ohio. The company agreed not to challenge whether C-8 can cause the diseases.

Three verdicts in the litigation totaled $19.7 million. Most recently, a jury last month ordered DuPont to pay a plaintiff $12.5 million, including $10.5 million in punitive damages.

The case is In re E.I. Du Pont De Nemours and Company C-8 Personal Injury Litigation, U.S. District Court for Southern Ohio, No. 13-2433.

Additional reporting by Erica Teichert in New York; Editing by Lisa Von Ahn

*Our Standards: <u>The Thomson Reuters Trust Principles.</u>*

---

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies    Terms of Use    Privacy

Do Not Sell My Personal Information



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2022 Reuters. All Rights Reserved.

# EXHIBIT Q

KNOW YOUR ENVIRONMENT. PROTECT YOUR HEALTH.



# DuPont, Chemours and Corteva Reach $4 Billion Settlement on 'Forever Chemicals' Lawsuits

PRESS CONTACT

**Monica Amarelo** (/news-insights/our-experts/monica-amarelo)
monica@ewg.org
(202) 939-9140

---

JANUARY 22, 2021

---

WASHINGTON – Today DuPont, Chemours and Corteva announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of the highly toxic **"forever chemicals"** (https://www.ewg.org/pfaschemicals/) known as PFAS.

DuPont was for decades a leading U.S. manufacturer of PFAS chemicals, which it used to make Teflon and other nonstick products. Chemours was created in 2015 when DuPont spun off its chemical division, in part to limit liability relating to PFAS chemicals. Corteva, formerly the agricultural division of DowDuPont, was spun off in 2019.

Chemours sued DuPont in 2019, claiming that DuPont's liability estimates were **"spectacularly wrong."** (https://www.bloomberg.com/news/articles/2019-06-28/chemours-says-dupont-s-liability-estimates-spectacularly-wrong) The case **was dismissed in 2020** (https://apnews.com/article/lawsuits-delaware-environment-courts-us-news-9c2ba2777ab8f5db3d40aaafoae8711c) over procedural issues.

The Environmental Working Group has **documented** (https://www.ewg.org/news-and-analysis/2019/08/decades-polluters-knew-pfas-chemicals-were-dangerous-hid-risks-public) the decades-long deception of chemical companies like DuPont burying the truth that PFAS build up in our blood and present risks to human health. EWG created a **timeline** (https://www.ewg.org/pfastimeline/) that shows by the 1960s, animal studies conducted by DuPont revealed that PFAS chemicals could pose health risks.

"For decades, these corporations have knowingly contaminated our drinking water, food supplies and the blood of virtually every person on the planet with these highly toxic chemicals," said Scott Faber, EWG's senior vice president for government affairs. "It's long past time that the polluters pay for their malicious drive toward profits over public health."

The binding memorandum of understanding establishes an immediate cost-sharing arrangement, including an escrow account worth upward of $1 billion to cover potential future legacy PFAS liabilities from before the spinoff. Under the terms of the agreement, expenses will be split 50-50, with DuPont and Corteva responsible for half and Chemours responsible for the other half. Both companies have agreed to share the costs of certain qualified expenses over a period no longer than 20 years or an amount over $4 billion.

Separately, DuPont, Corteva and Chemours have agreed to settle ongoing matters in the multidistrict PFOA litigation in Ohio for $83 million. DuPont will contribute $27 million, Corteva will contribute $27 million and Chemours will contribute $29 million to the settlement. The agreement resolves approximately 95 pending cases as well as unfiled matters.

"We are pleased to be able to resolve these personal injury claims for our clients ... in a way that provides compensation without the need for additional lengthy and expensive trials," said Robert Bilott, an attorney with Taft Stettinius & Hollister LLP who is co-lead counsel for plaintiffs in the Ohio litigation.

PFOA and other PFAS are called <u>"forever chemicals"</u> <sub>(https://www.washingtonpost.com/opinions/these-toxic-chemicals-are-everywhere-and-they-wont-ever-go-away/2018/01/02/82e7c48a-c4cc-11e7-a65d-1accfd7f097e_story.html)</sub> because they do not break down in the environment and are linked to cancer, <u>reproductive and developmental harms</u> <sub>(https://www.ewg.org/news-and-analysis/2019/09/pfas-and-developmental-and-reproductive-toxicity-ewg-fact-sheet)</sub>, and <u>reduced effectiveness of vaccines</u> <sub>(https://www.ewg.org/news-and-analysis/2020/11/pfas-chemicals-harm-immune-system-decrease-response-vaccines-new-ewg)</sub>. PFAS discharged over the past 50 years by companies like

DuPont will stay in the environment until actively remediated. PFAS contaminate <u>over 2,300 sites</u> <sub>(https://www.ewg.org/interactive-maps/pfas_contamination/)</sub> in the U.S.

There are no federally enforceable limits on any PFAS in drinking water, groundwater or soils, or any requirements to clean up PFAS under <u>the federal Superfund law</u> <sub>(https://www.ewg.org/news-and-analysis/2019/07/it-s-time-designate-pfas-hazardous-substance)</sub>. Only five states have placed drinking water limits on a <u>handful of PFAS</u> <sub>(https://www.awwa.org/LinkClick.aspx?fileticket=Q3AuGUndFUA%3d&portalid=0)</sub>, and the EPA has the ability to test for only <u>29 PFAS in drinking water</u> <sub>(https://www.epa.gov/pfas/epa-pfas-drinking-water-laboratory-methods)</sub>.

The feature film "<u>Dark Waters</u> <sub>(https://participant.com/film/dark-waters)</sub>" documents the real-life story of Bilott's 20-year fight against DuPont's contamination of the drinking water around Parkersburg, W.Va., with a PFAS chemical used to make Teflon. Bilott also published <u>"Exposure: Poisoned Water, Corporate Greed, and One Lawyer's Twenty-Year Battle Against Dupont,"</u> <sub>(https://www.simonandschuster.com/books/Exposure/Robert-Bilott/9781501172816)</sub> a riveting first-person account of how he revealed DuPont's dumping of PFOA and the decades-long coverup of the health hazards of PFAS.

###

*The Environmental Working Group is a nonprofit, non-partisan organization that empowers people to live healthier lives in a healthier environment. Through research, advocacy and unique education tools, EWG drives consumer choice and civic action.*

AREAS OF FOCUS:

**Toxic Chemicals** (/areas-focus/toxic-chemicals)    **PFAS Chemicals** (/areas-focus/toxic-chemicals/pfas-chemicals)

## Disqus Comments

Comments for this thread are now closed                    ✕

**Comments**    **Community**    🔒              ① **Login**  ▾

♡ **Favorite**  7         🐦 **Tweet**     f **Share**

                                    Sort by Best  ▾

This discussion has been closed.

RELATED NEWS

# Continue Reading



(/news-insights/news/2022/05/environmental-injustice-passing-costs-forever-chemicals-cleanup)

**FOOD & WATER** (/AREAS-FOCUS/FOOD-WATER)   **WATER** (/AREAS-FOCUS/FOOD-WATER/WATER)   **FAMILY HEALTH** (/AREAS-FOCUS/FAMILY-HEALTH)   **CHILDREN'S HEALTH** (/AREAS-FOCUS/FAMILY-HEALTH/CHILDRENS-HEALTH)   **TOXIC CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS)   **PFAS CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS/PFAS-CHEMICALS)

## Environmental injustice: Passing on the costs of 'forever chemicals' cleanup (/news-insights/news/2022/05/environmental-injustice-passing-costs-forever-chemicals-cleanup)

MAY 26, 2022

Setting a national drinking water standard for the "forever chemicals" known as PFAS – and passing the implementation costs to ratepayers and private well owners, while letting industry to keep...



(/news-insights/news/2022/05/fda-food-safety-inspections-plummet-despite-congressional-mandate)

**FOOD & WATER** (/AREAS-FOCUS/FOOD-WATER/), **FOOD** (/AREAS-FOCUS/FOOD-WATER/FOOD/), **FAMILY HEALTH** (/AREAS-FOCUS/FAMILY-HEALTH/), **CHILDREN'S HEALTH** (/AREAS-FOCUS/FAMILY-HEALTH/CHILDRENS-HEALTH/), **TOXIC CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS/), **FOOD CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS/FOOD-CHEMICALS/)

### FDA food safety inspections plummet, despite congressional mandate (/news-insights/news/2022/05/fda-food-safety-inspections-plummet-despite-congressional-mandate)

MAY 25, 2022

The number of U.S. food manufacturing facilities inspected each year by the Food and Drug Administration has fallen by thousands over the last decade, despite Congress creating a mandate to increase...

6/1/22, 11:49 AM    DuPont, Chemours and Corteva Reach $4 Billion Settlement on PFAS 'Forever Chemicals' Lawsuits | Environmental Working Group

Case 3:22-cv-00628-NJR  Document 38  Filed 06/01/22  Page 190 of 190  PageID #386



(/news-insights/news/2022/05/department-defense-fights-states-over-cleanup-toxic-forever-chemicals)

**FOOD & WATER** (/AREAS-FOCUS/FOOD-WATER)    **WATER** (/AREAS-FOCUS/FOOD-WATER/WATER)    **TOXIC CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS)    **PFAS CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS/PFAS-CHEMICALS)

### Department of Defense fights states over cleanup of toxic 'forever chemicals' (/news-insights/news/2022/05/department-defense-fights-states-over-cleanup-toxic-forever-chemicals)

MAY 25, 2022

For years, states have led the way in addressing the toxic "forever chemicals" known as PFAS, with six setting strict drinking water limits for the chemicals and at least eight using their power under...



(/news-insights/news/2022/05/ewg-applauds-senate-bill-close-food-chemical-safety-loopholes)

**FOOD & WATER** (/AREAS-FOCUS/FOOD-WATER)   **FOOD** (/AREAS-FOCUS/FOOD-WATER/FOOD)   **FAMILY HEALTH** (/AREAS-FOCUS/FAMILY-HEALTH)   **CHILDREN'S HEALTH** (/AREAS-FOCUS/FAMILY-HEALTH/CHILDRENS-HEALTH)   **TOXIC CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS)   **FOOD CHEMICALS** (/AREAS-FOCUS/TOXIC-CHEMICALS/FOOD-CHEMICALS)

### EWG applauds Senate bill to close food chemical safety loopholes (/news-insights/news/2022/05/ewg-applauds-senate-bill-close-food-chemical-safety-loopholes)

MAY 27, 2022

EWG applauds Sen. Ed Markey (D-Mass.) for today introducing legislation to ensure the safety of food chemicals by closing regulatory loopholes.

**ALL NEWS** (/NEWS-INSIGHTS/NEWS)

# EXHIBIT R

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

GMO FREE USA                                   :
                                               :
                                               :
v.                                             :            Case No. 2021 CA 004786 B
                                               :
COVER GIRL COSMETICS, *et al*.                 :

**ORDER**

The Court grants the motion to dismiss of Coty, Inc. and Noxell Corporation, the only

defendants named in the first amended complaint ("FAC") of plaintiff GMO Free USA, d/b/a

Toxin Free USA ("TFUSA").  The Court also grants defendants' motion for judicial notice of

certain documents.

**I.      BACKGROUND**

TFUSA is a nonprofit, public interest organization dedicated to consumer protection and

education.  TFUSA alleges that it tested one of defendants' products (CoverGirl TruBlend

Mineral Pressed Powder) for organic fluorine, fluorine is an indicator that a product contains per-

and polyfluoroalkyl substances ("PFAS"), and PFAS chemicals are damaging to human health

and to the environment.  *Id*. ¶¶ 31-35, 37-39.  TFUSA alleges that defendants violated the D.C.

Consumer Protection Procedures Act ("CPPA") by misrepresenting the safety and sustainability

of this product.

Under a briefing schedule approved by the Court, Coty and Noxell filed a motion to

dismiss ("Motion"), TFUSA filed an opposition ("Opp."), and defendants filed a reply ("Reply").

Defendants also filed a related motion for judicial notice.  TFUSA did not file an

opposition.

1

## II.      MOTION FOR JUDICIAL NOTICE

Defendants ask the Court to take judicial notice of four documents relating to their motion to dismiss:  (1) an EPA publication indicating, among other things, that there are thousands of different PFAS with potentially varying health and environmental effects (Ex. A); (2) a webpage of an organization cited by TFUSA in the FAC (the Environmental Working Group) indicating that PTFE is not toxic or environmentally unsafe (Ex. B); (3) the product and label for CoverGirl TruBlend Mineral Pressed Powder disclosing PTFE as an ingredient (Ex. C); and (4) an excerpt of the CTFA International Cosmetic Ingredient Dictionary that includes PTFE (Ex. D).  TFUSA did not respond in the time allowed by Rule 12-I(e).

The Court exercises its discretion to treat the motion as conceded.  Conceded substantive motions may generally be granted "where the movant has established a prima facie entitlement to relief."  *See District of Columbia v. Davis*, 811 A.2d 800, 804 (D.C. 2002).  The Court treats the motion for judicial notice as a substantive motion, and defendants have established a prima facie entitlement to the relief that they seek, demonstrating that no exhibit is "subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," or that they are "matters of public record."  *See Christopher v. Aguigui,* 841 A.2d 310, 311 n.2 (D.C. 2003) (quoting Fed. R. Evid. 201(b)); *Bostic v. District of Columbia*, 906 A.2d 327, 332 (D.C. 2006).

## III.     MOTION TO DISMISS

The Court grants defendants' motion to dismiss because TFUSA does not allege specific facts supporting a plausible inference that defendants engaged in any unfair trade practice in violation of the CPPA.

A.      The Rule 12(b)(6) standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Potomac Development Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up). "To satisfy Rule 8(a), plaintiffs must nudge their claims across the line from conceivable to plausible." *Tingling-Clemons v. District of Columbia*, 133 A.3d 241, 246 (D.C. 2016) (cleaned up).

The Court should "draw all inferences from the factual allegations of the complaint in the plaintiff's favor." *Carlyle Investment Management, LLC v. Ace American Insurance Co.*, 131 A.3d 886, 894 (D.C. 2016) (cleaned up). "A complaint should not be dismissed because a court does not believe that a plaintiff will prevail on its claim; indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* (cleaned up). However, legal conclusions "are not entitled to the assumption of truth," *Potomac Development Corp.*, 28 A.3d at 544 (cleaned up), so "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1128-29 (D.C. 2015) (cleaned up). "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (cleaned up).

The Court considers "an alleged unfair trade practice in terms of how the practice would be viewed and understood by a reasonable consumer." *Saucier v. Countrywide Home Loans*, 64

A.3d 428, 442 (D.C. 2013) (cleaned up).  "A consumer need not prove that she was 'mislead, deceived, or damaged' by a merchant's actions." *Frankeny v. District Hospital Partners*, 225 A.3d 999, 1004 (D.C. 2020) (quoting D.C. Code § 28-3904).  "In rare situations, courts may resolve the issue at the motion-to-dismiss stage, where the pleading does not plausibly allege that a reasonable consumer would be deceived." *Newton v. Kraft Heinz Foods Co.*, 2018 U.S. Dist. LEXIS 241406 at *7-8 (E.D.N.Y. Dec. 18, 2018) (cleaned up).

    **B.    Discussion**

    TFUSA plausibly alleges that the product contains PFAS based on its fluorine testing. Indeed, defendants acknowledge that its powder contains PTFE and that PTFE is a form of PFAS.  *See* Motion at 14 ("FDA specifically permits some forms of PFAS – fluoropolymers like PTFE – to be used in connection with production of food.").  However, TFUSA acknowledges that "[t]he term PFAS refers to a large class of synthetic chemicals" and "includes over '4,000 highly fluorinated aliphatic compounds.'"  Opp. at 1-2 (quoting FAC ¶ 34).  For the reasons discussed in Part II above, the Court takes judicial notice of the fact that different PFAS have potential different health effects and that PTFE has not been found to be toxic or environmentally unsafe.  In its amended complaint, TFUSA does not mention PTFE, much less allege that studies of PTFE indicate that it is harmful to humans (including in the quantities contained in defendants' product) or that PTFE is not sustainable.

    In its opposition, TFUSA asserts in conclusory terms that PTFE "is neither sustainable nor safe, as reasonable consumers understand these terms."  Opp. at 3.  However, even putting aside the fact that this assertion does not appear in the complaint, such "mere conclusory statements do not suffice" to defeat a motion to dismiss.  *See Sundberg*, 109 A.3d at 1129 (cleaned up).  TFUSA does not cite any study or analysis concluding that PTFE is unsafe to

humans or unsustainable.  TFUSA also asserts that "the *production* of PTFE can entail the discharge of other unsafe and unsustainable PFAS chemicals."  Opp. at 7.  But TFUSA does not allege any specific facts relating to the production of PTFE, and it must nudge its claim across the line from conceivable to plausible.  *See Tingling-Clemons*, 133 A.3d at 246.  Likewise, the possibility that other PFAS chemicals may be found in defendants' products (*see* Opp. at 7-8) does not warrant denial of defendants' motion or entitle TFUSA to discovery.

TFUSA acknowledges that defendants list PTFE as an ingredient on the label of CoverGirl powder, and TFUSA does not allege that defendants have made any specific representations about the safety or sustainability of this particular product.  TFUSA is correct that "[w]hile *generally* an accurate statement would not mislead a reasonable consumer, there is still a possibility that a reasonable consumer would still find an accurate statement misleading."  Opp. at 6, quoting *National Consumers League v. Bimbo Bakeries USA*, 2015 D.C. Super. LEXIS 5, at *30 (D.C. Superior Ct. Apr. 2, 2015).  Although this possibility exists, TFUSA's allegation stops short of the line between possibility and plausibility of entitlement to relief.  *See Potomac Development Corp.*, 28 A.3d at 544.  TFUSA does not allege specific facts supporting a plausible inference that any reasonable consumer is likely to find defendants' accurate statements about this particular product misleading.  In the absence of a deceptive statement about the product, it is not plausible that a reasonable consumer would be misled by an accurate list of a product's ingredients.  *See Cheslow v. Ghirardelli Chocolate Co*., 445 F. Supp. 3d 8, 20 (N.D. Cal. 2020).[1]

---

[1] *See Floyd v. Bank of America Corp.*, 70 A.3d 246, 255 (D.C. 2013) (relying on cases interpreting California's Consumers Legal Remedies Act because it contains language similar to terms used in the CPPA).

Furthermore, the representations that TFUSA contends are misrepresentations cannot plausibly be characterized as more than commercial "puffery" on which no reasonable person would rely. *See generally Pearson v. Chung*, 961 A.2d 1067, 1076 (D.C. 2008). TFUSA identifies three sets of representations. First, defendants' website states, "Our products have an important role to play in building a sustainable future" and "[t]o respond to evolving social and environmental challenges, we intend to keep sustainability at the heart of product innovation." FAC ¶ 22. Second, defendants issued a report acknowledging that "our products have an environmental impact" and stating, among other things, that "Our ambition is to put sustainability at the heart of innovation" and "We want to change the way we design, formulate and manufacture, in order to minimize our environmental impacts and create more innovative, cleaner products." *Id*. ¶ 23. Third, defendants issued a press release stating that CoverGirl "continues to define what it means to be a responsible beauty brand," "COVERGIRL continues to make good-for-you makeup and skincare, prioritizing the health of our consumers and the planet," and "COVERGIRL continues to identify areas where we can reduce our environmental impact, continuing to lead the way as the original clean brand which our consumers are proud to stand behind." FAC ¶¶ 27-29.

These statements about defendants' philosophy and aspirations cannot plausibly be interpreted as a representation that none of their products contains any PFAS chemical or any ingredient in a large class that includes some chemicals which are unsafe or unsustainable. TFUSA alleges that "PFAS are a group of synthetic chemicals that can provide certain marketable benefits for cosmetic products, including 'hydrophobicity and film-forming ability, which are thought to increase product wear, durability, and spreadability'" and that they have properties that make them useful for repelling oil and water. FAC ¶¶ 2-3. TFUSA does not

6

allege facts making it implausible that an environmentally conscious and responsible company could reasonably conclude that the benefits of using PTFE in a cosmetic product outweigh any unproven and speculative risks.

TFUSA does not allege facts supporting a plausible inference that defendants made an actionable omission in their marketing materials. "Under § 28-3904(f), a plaintiff must show that an omission was material and had a tendency to mislead," and "an omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action." *Saucier*, 64 A.3d at 442 (cleaned up); *see Frankeny*, 225 A.3d at 1005 (defining materiality). TFUSA does not identify with reasonable specificity the additional information about PTFE that defendants had to include in marketing materials to avoid a material omission. TFUSA does not cite any authority for the proposition that defendants were obligated to disclose not only that their product contains PTFE but also that PTFE is one of thousands of PFAS chemicals and that research does not indicate that PTFE is unsafe or unsustainable but does indicate that other PFAS chemicals may be unsafe or unsustainable.

A separate and independent basis for dismissing the claims against Noxell is that all of the misleading statements alleged by TFUSA were made by Coty, and TFUSA does not respond to this argument. Accordingly, TFUSA does not state a misrepresentation claim under the CPPA against Noxell.

## IV.    CONCLUSION

For these reasons, the Court orders that:

1.    The defendants' motion for judicial notice is granted.

2.    The defendants' motion to dismiss is granted.

3.      The claims against defendants are dismissed.

_____
                Anthony C. Epstein
                         Judge


Date:  June 1, 2022

Copies via CaseFileXpress to all counsel